**Steven M. Wilker,** OSB # 91188
      Direct Dial:    503.802.2040
      Direct Fax:    503.972.3740
      E-Mail:       steven.wilker@tonkon.com
**Paul W. Conable,** OSB # 97536
      Direct Dial:  (503) 802-2188
      Direct Fax:  (503) 972-3888
      E-mail:       paul.conable@tonkon.com
**James K. Hein,** OSB # 05462
      Direct Dial:    503.802.2129
      Direct Fax:    503.972.3829
      E-Mail:       james.hein@tonkon.com
Tonkon Torp LLP
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2099

**Ralph J. Temple** (admitted pro hac vice)
      Telephone:    541.482.9868
      Facsimile:    541.488.4907
      E-Mail:       Rtemple1340@aol.com
150 Myer Creek Road
Ashland, OR  97520

**Arthur B. Spitzer** (admitted pro hac vice)
      Telephone:    202.457.0800
      Facsimile:    202.452.1868
      E-Mail:       artspitzer@aol.com
American Civil Liberties Union
Of the National Capital Area
1400 20th Street, N.W., Ste. 119
Washington, D.C.  20036

      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| MICHAEL MOSS,  LESLEY ADAMS, BETH WILCOX, RICHARD ROYER, LEE FRANCES TORELLE, MISCHELLE ELKOVICH AND ANNA VINE, formerly known as Anna Boyd, INDIVIDUALLY AND ON BEHALF OF A CLASS OF PERSONS SIMILARLY SITUATED, AND JACKSON COUNTY PACIFIC GREEN PARTY, | Civil No.  06-3045-CL<br><br>**SECOND AMENDED COMPLAINT**<br>**Filed By Plaintiffs**<br><br>**DEMAND FOR JURY TRIAL** |
|         Plaintiffs, | |
|    v. | |

Page 1 – SECOND AMENDED COMPLAINT

**UNITED STATES SECRET SERVICE of the Department of Homeland Security, MARK SULLIVAN, Director of the United States Secret Service, in his official capacity, RALPH BASHAM, Former Director of the United States Secret Service, in his individual capacity, TIM WOOD, United States Secret Service Agent, in his official and individual capacities, ROB SAVAGE, United States Secret Service Agent, in his official and individual capacities, JOHN DOE 1, United States Secret Service Agent, in his official and individual capacities, participating in these actions and known to the Defendant Secret Service, but unknown at this time to Plaintiffs, DAVID TOWE, Chief of Police of Jacksonville, Oregon, in his official and individual capacities, CITY OF JACKSONVILLE, a municipal corporation of the State of Oregon, RON RUECKER, Superintendent of the Oregon State Police, in his individual capacity, TIMOTHY F. MCLAIN,  Superintendent of the Oregon State Police, in his Official capacity, RANDIE MARTZ, Captain of the Southwest Regional Headquarters of the Oregon State Police, in his official capacity, ERIC RODRIGUEZ, former Captain of the Southwest Regional Headquarters of the Oregon State Police, in his individual capacity, MIKE WINTERS, Sheriff of Jackson County, in his official and individual capacities, JACKSON COUNTY, a municipal corporation of the State of Oregon, JOHN DOES 2-20, that is, the commanding officers of other law enforcement agencies of public bodies participating in these actions, in their individual and official capacities, known to the identified Defendants, but unknown at this time to Plaintiffs, and MUNICIPAL DOES, the public bodies employing defendants John Does 2-20,**

Defendants.

<b>INTRODUCTION</b>

1.        This is a class action, pursuant to the First, Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution, 42 U.S.C. § 1983, 5 U.S.C. § 702, the Oregon

Page 2 – SECOND AMENDED COMPLAINT

Constitution, Article I, Sections 8, 9, 20 and 26, and the common law, seeking damages and injunctive and declaratory relief against the Defendants for unconstitutional, unlawful, and tortious actions against Plaintiffs and Plaintiff Class, growing out of and related to Defendants' disrupting a lawful assembly and protest demonstration by Plaintiffs and Plaintiff Class in Jacksonville, Oregon on October 14, 2004.  Although certain of Plaintiffs' claims were dismissed by the court on Defendants' Motions, those claims are restated here so as to preserve them for appeal.

        2.    The individual Plaintiffs are citizens of the United States and residents of Oregon who were in Jacksonville, Oregon, on October 14, 2004, assembled on the public sidewalks in front of and across the street from an inn where President George W. Bush was present, and conducting a demonstration ("the demonstration") to protest the President's policies. Plaintiff Jackson County Pacific Green Party ("Green Party") joins this action on behalf of its members, some of whom were participants in the demonstration.  Plaintiffs were exercising their First Amendment rights by demonstrating peacefully and in full accordance with the law when, without provocation or lawful basis, and without reasonable or adequate warning, the Defendants, by physical force, compelled Plaintiffs to vacate the sidewalks which by right they had chosen for their demonstration.  The Defendants, in addition to unlawfully and forcefully moving Plaintiffs, failed to give them an adequate warning and opportunity to move of their own volition.  Some Defendants physically assaulted members of Plaintiff Class by pushing them, striking them with clubs and firing pepper spray bullets into the assemblage.  The individual named Plaintiffs, each of whom was protesting in Jacksonville and each of whose constitutional rights were violated by the Defendants, accordingly bring this action under the United States Constitution, 42 U.S.C. § 1983, the Oregon Constitution and the common law to vindicate their own civil rights and the civil rights of Plaintiff Class.

        3.    Plaintiffs seek declaratory and injunctive relief prohibiting the United States Secret Service and Defendants Sullivan, Basham, Wood, Savage and John Doe 1 ("Secret Service Defendants"), Defendants McLain, Martz, and Rodriguez ("State Police Defendants"),

Page 3 – SECOND AMENDED COMPLAINT

the other Defendants ("Local Police Defendants"), and all persons acting as their agents or in concert with them, from engaging in the practice of or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

     (a)    Barring or forcing a lawful assembly of people from any area where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

     (b)    Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

     (c)    Barring or forcing anti-government demonstrators from areas where pro-government demonstrators are allowed to be present;

     (d)    Using excessive force to move nonviolent persons;

     (e)    Using riot-geared officers at nonviolent demonstrations; and

     (f)    Using non-lethal weapons or any form of chemical agents against nonviolent demonstrators.

     4.    Plaintiffs also seek an award of compensatory and punitive damages for violation of their constitutional rights, as well as for physical injuries, pain and suffering, against the individual Secret Service Defendants, except Defendant Sullivan, in their individual capacities; the individual Local Police Defendants, including the individual John Doe Defendants, in their individual capacities; and against Defendants Jackson County, the City of Jacksonville and the Municipal Does.

**JURISDICTION**

     5.    This action is brought pursuant to the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), 5 U.S.C. § 702 and 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

     6.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

Page 4 – SECOND AMENDED COMPLAINT

## PARTIES

### Plaintiffs

7.      At all times material hereto, Plaintiff Michael Moss ("Plaintiff Moss") was a resident of Jacksonville, Oregon, participating in the demonstration.  Plaintiff Moss was struck with clubs and shot with pepper spray bullets by police officers employed by or under the supervision or control of the State and Local Police Defendants.

8.      At all times material hereto, Plaintiff Lesley Adams ("Plaintiff Adams") was a resident of Jacksonville, Oregon, participating in the demonstration.

9.      At all times material hereto, Plaintiff Beth Wilcox ("Plaintiff Wilcox") was a resident of Shady Cove, Oregon, participating in the demonstration.

10.      At all times material hereto, Plaintiff Richard Royer ("Plaintiff Royer") was a resident of Trail, Oregon, participating in the demonstration.  Plaintiff Royer had a pre-existing asthma condition and was injured by the chemical agents in the bullets used by police officers employed by or acting as agents of the Police Defendants.

11.      At all times material hereto, Plaintiff Lee Frances Torelle ("Plaintiff Torelle") was a resident of Ashland, Oregon, participating in the demonstration.  At the time of the demonstration, Plaintiff Torelle was a minor.  Plaintiff Torelle was separated from the adults who accompanied her to the demonstration and was injured by the chemical agents used by police officers employed by or acting as agents of the Police Defendants.

12.      At all times material hereto, Plaintiff Mischelle Elkovich ("Plaintiff Elkovich") was a resident of Ashland, Oregon, and was a co-organizer of and participated in the demonstration.

13.      At all times material hereto, Plaintiff Anna Vine, formerly known as Anna Boyd ("Plaintiff Vine") was a resident of Ashland, Oregon, and was a co-organizer of and participated in the demonstration.  Plaintiff Vine is allergic to pepper spray and was injured by the chemical agents in the bullets used by police officers employed by or acting as agents of the Police Defendants.

Page 5 – SECOND AMENDED COMPLAINT

14.    The Jackson County Pacific Green Party is an unincorporated association and a political party in Jackson County, Oregon, some of whose members participated in the demonstration, and whose members, at the encouragement of the Party, regularly engage in peaceful demonstrations in Jackson County, in other parts of Oregon; and around the country, including at public appearances by senior federal officials protected by the United States Secret Service Defendants.

**Defendants**

15.    Defendant United States Secret Service of the Department of Homeland Security ("Defendant Secret Service") is and at all times material hereto was the federal agency responsible for providing security for the President and Vice President of the United States and certain other senior federal officials.

16.    Defendant Mark Sullivan ("Defendant Sullivan") is the Director of the United States Secret Service, acting within the scope of his employment and under color of law, and responsible for directing the operations of the Secret Service and supervising all Secret Service agents.  He is sued in his official capacity only.  Defendant Ralph Basham ("Defendant Basham") was the Director of the United States Secret Service on October 14, 2004, and prior to Defendant Sullivan taking office on May 30, 2006, acting within the scope of his employment and under color of law and responsible for directing the operations of the Secret Service and supervising all Secret Service agents.  Defendant Basham is sued in his individual capacity only.

17.    Defendants Tim Wood ("Defendant Wood"), Rob Savage ("Defendant Savage"), and John Doe I ("Defendant John Doe 1") at all times material hereto, were Secret Service agents at the scene of the demonstration, acting within the scope of their employment and under color of law, assigned to provide security for the President, and directing, requesting and communicating with the other Defendants in their operations related to the demonstration. Defendants Wood, Savage and Doe 1 are sued in their official and individual capacities.

18.    Defendant David Towe ("Defendant Towe") is and at all times material hereto was, the Chief of the Jacksonville Police Department, acting within the scope of his

employment and under color of state law, and responsible for directing the operations of the Jacksonville Police Department and supervising the law enforcement officers and agents acting under his authority, as well as law enforcement officers of other agencies who were at the scene of the demonstration to assist and support Defendants Towe and the City of Jacksonville. Defendant Towe is sued in his official and individual capacities.

19.     Defendant City of Jacksonville ("Defendant Jacksonville") is a duly organized municipal corporation under Oregon law, and a public body liable for the tortuous conduct of its agents and employees pursuant to ORS 30.260(4) and 30.265(1). Defendant Jacksonville employs Defendant Towe.

20.     Defendant Ron Ruecker (hereafter "Defendant Ruecker") is and, until January 2007, was the Superintendent of the Oregon State Police, acting within the scope of his employment and under color of state law, and responsible for directing the operations of the Oregon State Police and supervising the law enforcement officers and agents acting under his authority. Defendant Ruecker is sued in his individual capacity.

21.     Defendant Timothy F. McLain ("Defendant McLain"), as successor to Ron Ruecker, is currently the Superintendent of the Oregon State Police, having been appointed in January 2007, and is responsible for directing the operations of the Oregon State Police and supervising the law enforcement officers and agents acting under his authority. Defendant McLain is sued in his official capacity only.

22.     Defendant Randie Martz ("Defendant Martz"), as successor to Kurt Barthel, is the Captain of the Southwest Regional Headquarters of the Oregon State Police, acting within the scope of his employment and under color of state law, and responsible for directing the operations of said headquarters and supervising the law enforcement officers and agents acting under his authority. Defendant Martz is sued in his official capacity only (as was his predecessor, Kurt Barthel).

23.     On October 14, 2004, Defendant Eric Rodriguez ("Defendant Rodriguez") was Captain of the Southwest Regional Headquarters of the Oregon State Police acting within

Page 7 – SECOND AMENDED COMPLAINT

the scope of his employment and under color of state law, and responsible for directing the operations of said Headquarters and supervising the law enforcement officers and agents acting under his authority.  Defendant Rodriguez is sued in his individual capacity only.

24.    Defendant Mike Winters ("Defendant Winters") is and at all times material hereto was, the Sheriff of Jackson County, acting within the scope of his employment and under color of state law, and responsible for directing the operations of the Jackson County Sheriffs Office and supervising the law enforcement officers and agents acting under his authority.  Defendant Winters is sued in his official and individual capacities.

25.    Defendant Jackson County ("Defendant Jackson County") is a political subdivision of the state of Oregon and is a public body liable for the tortious conduct of its agents and employees pursuant to ORS 30.260(4) and 30.265(1).  Defendant Jackson County employs Defendant Winters.

26.    Defendants John Does 2-20 were the commanding officers of, and Defendant Municipal Does were the governmental bodies employing, other law enforcement agents participating in the actions of the identified Defendants taken against Plaintiffs during the demonstration, which Defendants' identities are known to the identified Defendants, but unknown at this time to Plaintiffs.  At all relevant times Defendant John Does 2-20 were acting under color of state law and acting within the scope of their authority.  Defendant John Does 2-20 are sued in their official and individual capacities.

27.    The true names of all John Doe and Municipal Doe Defendants shall be substituted and this Complaint shall be amended when their identities are established during discovery.

28.    At all times material hereto, the term "Secret Service Defendants" refers to the Defendant Secret Service, individual defendants Sullivan, Basham, Wood and Savage and John Doe 1.

29.    The term "State Police Defendants" refers to Defendants Ruecker, McLain, Martz, and Rodriguez.

Page 8 – SECOND AMENDED COMPLAINT

30.    The term "Local Police Defendants" refers to the City of Jacksonville, Jackson County, individual Defendants Towe and Winters, John Does 2-20, and the Municipal Doe Defendants.  The term "Police Defendants" refers collectively to the "State Police Defendants" and the "Local Police Defendants."

## CLASS ALLEGATIONS

31.    The Individual Plaintiffs bring this suit on behalf of themselves and as a class action pursuant to the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the class of all persons, adults and children, assembled on, or denied access to assemble on, or forced to move away from, the sidewalks adjacent to and across the street from the Jacksonville Inn, between Third and Fourth Streets, in Jacksonville, Oregon, on the evening of October 14, 2004 ("Plaintiff Class").

32.    On information and belief, Plaintiff Class includes approximately 200 to 300 persons, making joinder of all class members impracticable.

33.    Questions of law and fact common to members of Plaintiff Class include:

(a)    Whether the Defendants had a lawful basis to order the class to move away from the public sidewalks where they were assembled and exercising First Amendment rights;

(b)    Whether the conduct of Plaintiff Class presented a clear and present danger that justified the taking of law enforcement action that interfered with Plaintiff Class's exercise of First Amendment rights;

(c)    Whether Plaintiff Class as a whole was peaceful and orderly at the time that the Defendants physically assaulted Plaintiff Class members by pushing them, striking them with clubs, and firing pepper spray bullets into Plaintiff Class;

(d)    Whether the Defendants' decision to move and to use force against Plaintiff Class and their action in doing so was based on the content of the speech of Plaintiff Class rather than security considerations;

(e)    Whether the Police Defendants gave Plaintiff Class an adequately

intelligible order to disperse and a reasonable opportunity to do so prior to taking physical action against Plaintiff Class;

(f)     Whether the Defendants had a lawful basis to employ physical force against Plaintiff Class, including forceful shoving, firing pepper spray bullets into Plaintiff Class and striking demonstrators with clubs, and whether the Defendants' actions in doing so constituted excessive force;

(g)     Whether there was unjustified firing of pepper spray bullets into Plaintiff Class and whether that constituted excessive force;

(h)     Whether the Defendants lacked reasonable grounds to believe and lacked a good faith belief that Plaintiff Class had violated any laws or that Plaintiff Class was engaged in any conduct that justified ordering them to move, moving them, and moving them with physical force;

(i)     Whether the Defendants' actions violated the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, the Oregon Constitution, Article I, Sections 8, 9, 20, and 26, and state common law rights of Plaintiff Class;

(j)     Whether the Secret Service Defendants have engaged in a nationwide pattern and practice of unconstitutionally creating excessively large security zones around Secret Service protectees that are not based on security criteria; and

(k)     Whether the Secret Service Defendants have engaged in a nationwide pattern and practice of unconstitutionally excluding anti-government demonstrators from traditional public forums where pro-government demonstrators, and other unscreened members of the public, are allowed to congregate.

34.     The named Plaintiffs' claims are typical of the claims of all members of Plaintiff Class.  The interests of the named class representatives are not antagonistic to and are aligned with the interests of Plaintiff Class because each named Plaintiff's claim stems from the same events that founded the basis of the class claims and is based upon the same legal or remedial theory.  The named Plaintiffs will fairly and adequately protect the interests of

members of Plaintiff Class.  Plaintiffs are represented by counsel competent to prosecute this civil rights class action.

35.     Questions of law and fact common to the members of Plaintiff Class predominate over any questions affecting only individual members, including legal and factual issues relating to damages.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will be more efficient, convenient and desirable than individual litigation of numerous claims.  Plaintiff Class is readily defined and is manageable, and prosecution of a class action will eliminate the possibility of repetitious litigation.

## FACTS

### The Demonstration at the Jacksonville Inn

37.     On October 14, 2004, President George W. Bush made a campaign appearance in Central Point, Oregon.  President Bush was scheduled to spend the evening at the Jacksonville Inn Honeymoon Cottage located on Main Street, west of Third Street, and south of California Street, approximately two blocks from the Jacksonville Inn, in Jacksonville, Oregon.

38.     Plaintiffs Elkovich and Vine organized a demonstration to take place in Jacksonville, Oregon on the afternoon and evening of October 14, 2004.  The demonstrators planned to gather during the afternoon in Griffin Park, located on South Fifth Street in Jacksonville, about two blocks from the Jacksonville Inn, then, beginning at about 5:30 PM, to march from Griffin Park to the sidewalks on California Street between 3rd and 4th Streets, a location about two blocks away from the Honeymoon Cottage in Jacksonville, Oregon, where the President was scheduled to spend the evening.

39.     Prior to the demonstration, Plaintiff Elkovich spoke separately with Defendant Towe, Chief of the Jacksonville Police, and with Defendant Winters, Sheriff of Jackson County.  Plaintiff Elkovich informed these Defendants of the details of the planned demonstration and the route the demonstrators planned to follow.  Plaintiff Elkovich told these

Page 11 – SECOND AMENDED COMPLAINT

Defendants that parents and their young children were expected to participate, that she wanted to avoid any possible problems, and that the demonstration was to be peaceful and law-abiding, with handouts to participants so informing them.  Plaintiff Elkovich also emphasized that due to the law-abiding nature of the gathering, riot-geared police would not be necessary and asked that they not be present.  Defendant Towe assented to the route and location of the demonstration and said he did not plan to use riot-geared police.

40.    Plaintiff Elkovich asked Defendant Towe to be accessible to her for coordination purposes at the scene of the demonstration.  Defendant Towe declined, and did not propose an alternative means for the police to maintain coordination with demonstration leaders during the demonstration.

41.    Defendant Winters told Plaintiff Elkovich that protecting the rights of demonstrators was one of his priorities and that officers in riot gear would be in discreet locations, but not deployed unless needed.  Defendant Winters assented to the route and location of the demonstration and assured Plaintiff Elkovich that if demonstrators stayed on the sidewalks, there would not be any problems.  Defendant Winters did not propose any means for the police to maintain coordination with demonstration leaders during the demonstration.

42.    Beginning about 5:00 PM on October 14, 2004, Plaintiffs and Plaintiff Class, consisting of about 200 to 300 anti-Bush demonstrators, including elderly people, families, children, and babes in arms, assembled in Griffin Park in Jacksonville, Oregon.

43.    In Griffin Park, Plaintiff Vine told the assembled anti-Bush demonstrators of the demonstration plan, that the plan had been discussed with Defendants Towe and Winters, that Defendants Towe and Winters had assured Plaintiff Elkovich that the demonstrators would not be disturbed if they remained on the sidewalks, and that there was to be no disorder.

44.    The State and Local Police Defendants' police officers were located throughout downtown Jacksonville.  At about 6:00 PM, the anti-Bush demonstrators, in accordance with the planned demonstration and the route which Plaintiff Elkovich had cleared with Defendants Towe and Winters, left Griffin Park and proceeded to California Street between

Page 12 – SECOND AMENDED COMPLAINT

Third and Fourth Streets.

45.     At that time, Plaintiffs and Plaintiff Class did not know that the President would decide to come to the Jacksonville Inn on California Street for dinner.  Plaintiffs and Plaintiff Class conducted their demonstration with chants, slogans, and signs.   All class members were orderly, interacted with police without incident, and remained on the sidewalks.

46.     Immediately adjacent to the anti-Bush demonstrators was a similarly sized group of pro-Bush demonstrators, also chanting and exhibiting signs.  The pro-Bush demonstrators began at the western curbs of Third Street and extended west along California Street.  The anti-Bush demonstrators began at the eastern curbs of Third Street and extended east to Fourth Street.  The two groups were separated only by the 37-foot width of Third Street.  Interactions between the anti-Bush demonstrators and the pro-Bush demonstrators were courteous and even jovial.

### The President Decides to Dine at the Inn

47.     While the President was en route to Jacksonville, he decided to dine at the Jacksonville Inn instead of at the Honeymoon Cottage.  At about 7:00 P.M., the pro-Bush and anti-Bush demonstrators learned that the President was coming to dine at the Jacksonville Inn on the north side of California Street between Third and Fourth Streets.  The Jacksonville Inn had a dining area located on a patio at the rear of the Inn.

48.     After learning of the President's dinner plan, the participants in both the pro-Bush and anti-Bush demonstrations clustered more on the north side of California Street than on the south side.  The respective locations of the group of pro-Bush demonstrators and Plaintiff Class of anti-Bush demonstrators are shown as "A" and "B", respectively, on the map attached as Exhibit A to this Second Amended Complaint.  As shown on the map, the location of the eastern-most pro-Bush demonstrators was not significantly different from the location of the western-most anti-Bush demonstrators.  Both sets of demonstrators had equal access to the President during his arrival at the Jacksonville Inn and would have had equal access during his departure had the anti-Bush demonstrators not been violently moved two blocks east as alleged

Page 13 – SECOND AMENDED COMPLAINT

below.

49.    Shortly after 7:00 PM, just prior to the President's arrival at the patio dining area at the rear of the Jacksonville Inn, at the request of the Secret Service agent on site, a group of the State and Local Police Defendants' police officers dressed in riot gear cleared the Third Street alley all the way to the patio dining area directly behind the Jacksonville Inn.  Police also blocked Third Street, including both sidewalks, north of California Street.  Riot-geared police officers cleared the California Street alley running along the east side of the Inn and were stationed at the entrance of the California Street alley to prevent any unauthorized persons from entering the alley.  No demonstrators attempted to enter the California Street alley at any time after the police cleared the alley.  At the intersection of Third and California Streets, the State and Local Police Defendants' police officers began barring members of both groups of demonstrators from crossing the streets, and confining them to the sidewalks on which they were standing.

50.    The anti-Bush demonstrators along California Street did not have any access to the President or any line of sight to the dining patio at the rear of the Jacksonville Inn. As shown on Exhibit A, the anti-Bush demonstrators were blocked by the buildings along California Street – the U.S. Hotel, the Bijou, the Jacksonville Inn, and the Sterling Savings Bank – and by the riot-geared police officers stationed at the entrance of the California Street alley.

51.    President Bush and his party arrived at the back of the Jacksonville Inn at approximately 7:15 PM, and the President entered the back patio of the Inn through the back patio door.  The patio dining area was enclosed by a 6-foot high wooden fence, blocking a view of those in the patio dining area from the sight of all those outside that area.

52.    Also present inside the Inn and the patio dining area were dozens of guests and diners.  Defendants did not screen these persons or order or force them to leave the patio. Also present, just upstairs from the patio dining area, was a group of approximately thirty persons participating in an assemblage with expressive content, namely, an educational discussion of medical issues.  Some members of the medical group, who came downstairs to get

a glance at the President, found an unguarded door leading into the patio dining area, opened that door and stood looking at the President from a distance of about 15 feet.

**The Secret Service Directs Removal of Anti-Bush Demonstrators**

53.    Fifteen minutes later at about 7:30 PM, after class members' anti-Bush chants and slogans could be heard within the patio where the President was dining, Secret Service Defendants Wood, Savage and John Doe 1 requested or directed Defendant Towe and the other Police Defendants to clear California Street of all persons between Third and Fourth Streets – that is, the members of Plaintiff Class – and to move them to the east side of Fourth Street and subsequently to the east side of Fifth Street.

54.    The Defendants claim that the Defendant Secret Service agents told Defendant Towe and the Police Defendants that the reason for the Secret Service's request or direction was that they did not want anyone within handgun or explosive range of the President. To the extent the agents in fact made such an assertion, the assertion was false and Defendant Towe and the Police Defendants knew or should have known that it was false, because there was no significant security difference between the two groups of demonstrators.

55.    Had that been the true reason for the request or direction, the Defendant Secret Service agents would have requested or directed that all persons dining, staying at, or visiting the Inn who had not been screened by the Secret Service or the Police Defendants be removed from the Inn.  Likewise, had that been the true reason for the request or direction, the Defendant Secret Service agents would have requested or directed that the pro-Bush demonstrators at the corner of Third and California be moved further to the west so that they would not be in range of the President as he travelled from the Inn to the Honeymoon Cottage where he was staying.  The Honeymoon Cottage was at 115 Main Street, one block south of California Street and West of Third Street.  The line marked "C" on Exhibit A shows the direction to the Honeymoon Cottage from the rear of the Jacksonville Inn.

56.    Instead, the Defendant Secret Service Agents left the pro-Bush demonstrators on the Northwest and Southwest corners of Third and California Streets, marked

Page 15 – SECOND AMENDED COMPLAINT

as "A" on Exhibit A, to cheer for President Bush as he traveled to the Honeymoon Cottage, while causing the anti-Bush demonstrators to be violently moved two blocks east, well out of the President's view.

57.    The Defendant Secret Service agents targeted only the anti-Bush demonstrators to be cleared from the area, even though they were much farther from the President than the unscreened diners, hotel guests, and other visitors, including the assembled medical group, inside the Inn, and even though they had no greater access to the President than the pro-Bush demonstrators.  In fact, having moved the anti-Bush demonstrators two blocks east, the Defendant Secret Service agents left the pro-Bush demonstrators with unimpeded access to the President along the route to the Honeymoon Cottage, demonstrating that the purported reason for moving the anti-Bush demonstrators was false.

58.    Defendants Wood, Savage and John Doe 1 did not direct or request that Defendant Towe or the other Police Defendants move or screen the pro-Bush demonstrators outside the Inn or the unscreened diners, hotel guests, and other visitors, including the assembled medical group, inside the Inn.

59.    At approximately 7:45 PM, the Police Defendants formed a line of riot-geared police officers across California Street on Third Street, facing east (i.e., facing the anti-Bush demonstrators and with their backs to the pro-Bush demonstrators). Behind them was an armored personnel carrier. The Police Defendants made amplified announcements, unintelligible to many class members, that the assembly was now unlawful, and ordered Plaintiffs and Plaintiff Class of anti-Bush demonstrators to move from the sidewalks where they were lawfully assembled to the east side of Fourth Street. The Police Defendants failed to contact Plaintiffs Elkovich or Vine, the known leaders of the anti-Bush demonstration, made no effort to coordinate with them, and, by restricting their movement, prevented them from assisting in communicating with Plaintiff Class.

### The Police Defendants Violently Move the Anti-Bush Demonstrators

60.    Without attempting to determine whether the assemblage understood the

announcements, and without allowing time for the class of about 200 to 300 persons crowded on the sidewalks to move, the Police Defendants and their police officers, including officers clad in riot gear, forced the anti-Bush demonstrators to move east along California Street, in some cases by violently shoving Plaintiffs and Plaintiff Class members, striking them with clubs and firing pepper spray bullets at them.

61.    The Police Defendants continued forcefully to move class members from where they were demonstrating, using clubs, pepper spray bullets, and forceful shoving, east along California Street until they had all crossed Fourth Street, and then to the east side of Fifth Street.  After moving the class members across Fifth Street, the Police Defendants divided the class members into two groups, encircling each group and preventing class members from leaving the area. Some class members, including those with young children, were attempting to leave the area. Several families had become separated, including children; some of whom were lost, frightened and traumatized as a result of the Police Defendants' actions.

62.    During the entire time these actions were being taken against Plaintiffs and Plaintiff Class members, the Defendants did not take any action to move the pro-Bush demonstrators or to move the unscreened diners, hotel guests, and other visitors, including the assembled medical group, who were inside the Inn.

**The Secret Service's Long History and Actual Policy of Discriminating**

**Against First Amendment Expression**

63.    Since the early 1960s, each American President has employed an Advance Team to work together with the Secret Service to manage the twin goals of protecting the President and providing him access to the public in his public appearances and travels.  Each President has established different policies in the balance between these two goals.

64.    The Secret Service has a long history of going beyond security measures necessary to protect the President, and manipulating its security function to protect Presidents from First Amendment-protected expressions of opposition by individuals and groups.  This has required the courts periodically to examine and to declare invalid, unlawful, or excessive, so-

Page 17 – SECOND AMENDED COMPLAINT

called security measures for which the Secret Service could not show a reasonable basis.

65.     As long ago as 1969, in *Quaker Action Group v. Hickel,* 421 F.2d 1111, 1117 (D.C. Cir. 1969), the United States Court of Appeals for the District of Columbia Circuit upheld a preliminary injunction against Secret Service instigated regulations limiting demonstrations on the sidewalk adjacent to the White House and in neighboring Lafayette Park. The court specifically rejected the notion that it must accept the Secret Service's purported security rationale, instead holding that "we must also assure ourselves that those conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat." The court went on to note: "The history of this country, moreover, records no effort of which we are aware to assault a public figure by mass violence; assassinations have characteristically been the work of single individuals or at most small groups." The same statement is as true today as it was 40 years ago. And following a trial on the merits, the Court of Appeals concluded that the numerical limits sought by the Secret Service were not supportable.

66.     The United States Court of Appeals for the Ninth Circuit has not ruled in a Secret Service case, but in *Bay Area Peace Navy v. U.S.*, 914 F.2d 1224, 1228 (9th Cir. 1990), the court invalidated a United States Coast Guard security zone, ruling that the government "is not free to foreclose expressive activity in public areas on mere speculation about danger …. [o]therwise the government's restriction on First Amendment expression in public areas would become essentially unreviewable."

67.     The White House under President George W. Bush, more than any prior Presidency, sought to prevent or minimize the President's exposure to dissent or opposition during his public appearances and travels, while at the same time maximizing – within the demands of  reasonable security – his exposure to supporters and to the public in general.

68.     This policy was set out in some detail in the official "Presidential Advance Manual," dated October 2002, instructing the White House Advance Team on how to keep protesters out of the President's vicinity and sight. A redacted copy of the "Presidential Advance

Page 18 – SECOND AMENDED COMPLAINT

Manual," which was produced and filed in *Rank v. Hamm*, U.S.D.C., S.D. W.Va., Case No. 2:04-cv-00997, is attached as Exhibit B.[1]  Viewpoint discrimination by the Secret Service in connection with President Bush was the official policy of the White House.  The unredacted excerpts include discussions about how to deal with protesters, how to disrupt protests, and how to insure that protesters are kept out of sight or hearing of the President and the media.  These facts demonstrate not just a pattern and practice, but an official White House policy of seeking to stifle dissent.

69.    The Secret Service Defendants worked closely with the Advance Team to achieve the goal set out in the Presidential Advance Manual, and to concoct, manipulate, and gerrymander false security rationales for the exclusion or distancing of opposition, dissent, or protest expressive activity from proximity to the President, while minimizing the distancing of the public in general and supporters.

70.    The Secret Service's actual but unwritten policy and practice was to work with the White House under President Bush to eliminate dissent and protest from presidential appearances.  When the President's plans changed on October 14, 2004, there was no time for the Advance Team to take action to stifle and suppress the protest.  Instead, the President's team relied on the Secret Service to do so by directing and requesting local authorities to clear both sides of California Street between Third and Fourth Streets, and subsequently between Third and Fifth Streets, where the protesters opposing President Bush were congregated, while leaving undisturbed the nearby pro-Bush demonstrators, as well as the unscreened diners, hotel guests, and other visitors, including the assembled medical group, who were inside the Inn.

71.    Defendants Secret Service and Basham have promulgated or caused to be promulgated written guidelines, directives, instructions and rules which purport to prohibit Secret Service agents from discriminating between anti-government and pro-government demonstrators, between demonstrators and others engaged in expressive assembly, and between

---

[1] The reference to Exhibit C in the document is the exhibit referent it had in the West Virginia action.

Page 19 – SECOND AMENDED COMPLAINT

demonstrators and members of the public not engaged in expressive assembly, but these documents do not represent the actual policy and practice of the Secret Service, and are a sham, designed to conceal and immunize from judicial review the actual policy and practice described in paragraphs 63 to 70 of this Second Amended Complaint.

72.    The actions of the Secret Service Defendants during the episode at the Jacksonville Inn on October 14, 2004, were an implementation of this actual policy and practice, which included employing, directing, requesting, or encouraging state and local authorities to assist in implementing the discriminatory policy.

73.    Inasmuch as the First Amendment requires that governmental restrictions on expressive conduct be based on a compelling governmental interest unrelated to the fact that the conduct contains expressive content, the Secret Service policy and practices described in paragraphs 63 to 70 of this Second Amended Complaint and the Secret Service Defendants' actions at the Jacksonville Inn on October 14, 2004, violated three distinct principles of this First Amendment standard:

(a)    Imposition of greater restrictions on Plaintiff Class than on the pro-Bush demonstrators outside the Inn violated the principle prohibiting viewpoint discrimination.

(b)    Imposition of greater restrictions on Plaintiff Class than on the medical group assembled inside the Inn violated the principle prohibiting content discrimination against a political assemblage as compared to a non-political assemblage.

(c)    Imposition of greater restrictions on Plaintiff Class than on individual diners and guests inside the Inn violated the principles prohibiting content and or viewpoint discrimination against persons solely because they are assembled to express a political or opposing point of view.

74.    The Secret Service Defendants had no valid security reason to request or order the eviction of Plaintiffs and Plaintiff Class from the north and south sidewalks of California Street between Third and Fourth Streets on October 14, 2004.

75.    In the United States, no attempt to harm any President has ever been made

Page 20 – SECOND AMENDED COMPLAINT

from a group assembled to express opposition, protest, or dissent from the President's policies.

76.    Plaintiff Class of anti-Bush demonstrators were a peaceful group, consisting of families, elderly persons, children, and mothers with babes in arms, whose leaders had contacted Defendants Winters and Towe in advance to assure them of their intention to protest peacefully in a law abiding manner.

77.    The Defendant Secret Service agents had at least 20 minutes from the time the President decided to dine at the Jacksonville Inn to assess the security situation at and around the Inn.  During that time, the Defendant Secret Service agents had the police clear the two alleys adjacent to the Inn, but made no effort to have the anti-Bush demonstrators moved.  It was only after the President was in the patio dining area and the chants of the anti-Bush demonstrators could be heard from the patio that the Defendant Secret Service agents targeted Plaintiffs and Plaintiff Class of anti-Bush demonstrators to be moved from the public sidewalks on California Street.

78.    This action by the Secret Service Defendants did not comport with normal, lawful Secret Service security measures during Presidential public appearances or visits to hotels, restaurants, or other publicly accessible buildings, absent threats, reports or other special circumstances suggesting the need for unusual security measures.  Specifically:

(a)    There had been no reports, threats, or other information suggesting a potential attempt to harm the President, or any other special circumstances suggesting the need for unusual security measures.

(b)    It is not the general practice of the Secret Service, in the absence of special circumstances, to establish a security zone extending an entire city or town block around hotels, restaurants, or other buildings the President may be visiting in the United States.

(c)    The Secret Service has specific statutory authority to establish security zones within "buildings and grounds" visited by the President, but not on adjacent public sidewalks and streets.

(d)    On information and belief, the criterion of keeping people out of

Page 21 – SECOND AMENDED COMPLAINT

handgun range of the President was made up for this particular occasion, having no precedent in any prior security zones or Presidential appearances, in the absence of special circumstances.

(e)    On information and belief, the criterion of keeping people out of explosive range of the President was made up for this particular occasion, having no precedent in any prior security zones or Presidential appearances, in the absence of special circumstances.

79.    Plaintiff Class of anti-Bush demonstrators posed no greater risk of assaulting the President with a handgun or explosive than the pro-Bush group of demonstrators. The Jacksonville Inn and other buildings on California Street and the riot-geared police securing the California Street alley blocked the view and line of sight from the sidewalk in front of the Inn and along the north side of California Street to the patio dining area at the rear of the Inn, making it impossible for Plaintiff Class of anti-Bush demonstrators to assault the President with a handgun or explosive from that location.

80.    Given their location, Plaintiff Class of anti-Bush demonstrators posed no greater risk and in fact posed less risk of assaulting the President with a handgun or explosive, than the guests, diners, and the assembled medical group inside the Inn.  Specifically, the Secret Service Defendants knew or should have known:

(a)    Plaintiff Class of anti-Bush demonstrators had no more advance knowledge than the people inside the Inn that the President was coming to the Inn for dinner in the patio dining area; thus, there was no more reason to suspect them of harboring hidden weapons or plans for assault than the people inside the Inn.

(b)    The guests, diners, and the assembled medical group inside the Inn posed a greater risk, if any, of assaulting the President with a handgun or explosive than anyone outside of the Inn; for example, several members of the medical group assembled inside the Inn opened an unguarded door to the patio dining area and stood looking at the President from a distance of only fifteen feet.

(c)    The only operative distinction between the unscreened diners, guests and other visitors, including the assembled medical group, inside the Inn, and Plaintiff

Page 22 – SECOND AMENDED COMPLAINT

Class of anti-Bush demonstrators outside the Inn, was that the anti-Bush demonstrators were expressing a point of view opposed to the President and his policies and that those inside the Inn were not doing so.

       81.    The actions of the Secret Service Defendants at the Jacksonville Inn on October 14, 2004, were consistent with and taken pursuant to the actual but unwritten policy and practice of the Secret Service to shield the President from seeing or hearing anti-Bush demonstrators and to prevent anti-Bush demonstrators from reaching the President with their message. The actions of the Secret Service Defendants at the Jacksonville Inn on October 14, 2004, were also consistent with the Bush administration's official policy of shielding the President from seeing or hearing anti-Bush demonstrators and preventing anti-Bush demonstrators from reaching the President with their message as reflected in the Presidential Advance Manual, redacted portions of which are attached as Exhibit B to this Second Amended Complaint.

       82.    According to published reports, the Secret Service has engaged in these kinds of actions against anti-government expressive activity on numerous other occasions, including, without limitation:

       (a)    At President Bush's appearance at Western Michigan University in Kalamazoo, Michigan, on March 27, 2001, a demonstrator was carrying a sign sarcastically commenting on the prior Presidential election ("Welcome Governor Bush"). At the direction of the Secret Service, a university police officer ordered the demonstrator to go to a "protest zone" behind an athletic building located 150-200 yards from the parade route even though several hundred people who were not carrying signs were allowed to remain in the area where the protester had stood. The protest zone was located so that people sent there could not be seen by the President or his motorcade. When the demonstrator refused to enter the protest zone, but insisted on standing where other people had been allowed to gather, he was arrested, also at the direction of the Secret Service.

       (b)    On August 23, 2002, in Stockton, California, at an appearance in a

local park to support a Republican gubernatorial candidate, at the direction of the Secret Service, protesters were ordered behind a row of large, Greyhound-sized buses, which placed them out of sight and earshot of their intended audience, and were advised that if they went to the other side of the buses, a location visible to those attending the event, they would be arrested. People who carried signs supporting the President's policies and spectators not visibly expressing any views were allowed to gather in front of the buses, where event attendees could see them.

(c) On January 22, 2003, in St. Louis, Missouri, President Bush made a visit to announce an economic plan. At the direction of the Secret Service, protesters carrying signs opposing the economic plan and criticizing the President's foreign policy were sent to a "protest zone" located in a public park, three blocks away and down an embankment from where the President was speaking. Neither people attending the event nor people in the motorcade could see the protesters in the protest zone. One protester was arrested for refusing to enter the protest zone. Standing near the location where the protester was arrested was a group of people who were not asked to move, including a woman who carried a sign reading, "We Love You President Bush," who was neither ordered into the protest zone nor arrested.

(d) On September 2, 2002, in Neville Island, Pennsylvania, in connection with a speech by President Bush, at the direction of the Secret Service, anti-Bush demonstrators were sent to a "designated free speech zone" located on a large baseball field one-third of a mile away from where President Bush was speaking. Only people carrying signs critical of the President were required to enter and remain. Many people carrying signs supporting the President and his policies were allowed to stand alongside the motorcade route right up to where the President was speaking. When retired steelworker Bill Neel refused to enter the protest zone and insisted on being allowed to stand where the President's supporters were standing, he was arrested for disorderly conduct and detained until the President had departed.

(e) In December 2002, in Philadelphia, Pennsylvania, at the direction of the Secret Service, protesters opposed to President's Bush's then-proposed tax cut plan were

Page 24 – SECOND AMENDED COMPLAINT

required to congregate in a protest zone well out of sight to the route to be taken by the President and the hotel where the President would be staying, while members of the public supporting the President or not expressing a view opposed to the President were permitted access to the sidewalks adjacent to the hotel and along the route he would be traveling.

(f)     In May 2003, in connection with a speech by President Bush in Omaha, Nebraska, a group opposed to the President's tax cut plan planned a protest during the president's stop at a local plastics plant. At the direction of the Secret Service, the demonstrators were required to hold their protest more than half a mile away from the event.

(g)     On June 17, 2003, in Washington, D.C., the President spoke at the Hilton Hotel.  Protesters from the Children's Defense Fund criticizing the President's policies were picketing on the north side of T Street, adjacent to the hotel.  A Secret Service agent, who showed them his badge, directed the protesters across the street.  Spectators not visibly expressing any views were allowed to walk on the sidewalk in front of the hotel.

(h)     In July 2003, in connection with a protest at a presidential visit to the Treasury Financial Facility in Philadelphia, Pennsylvania, demonstrators critical of President Bush were treated differently and less favorably than demonstrators supportive of the President. After the anti-Bush demonstrators were told that no one could protest directly across the street from the building, they agreed to a location diagonal from the building the President was visiting.  When they noticed that pro-Bush demonstrators were being permitted to be directly across the street (where the anti-Bush demonstrators had been told no one would be permitted), they complained, and the Secret Service attempted to move the anti-Bush demonstrators even farther away.  When a court blocked the local police and Secret Service from doing so, they then parked several large police vans in front of the anti-Bush demonstrators, thereby ensuring that the demonstrators would not be seen or heard by President Bush.

(i)     On July 4, 2004, in Charleston, West Virginia, Jeffrey and Nicole Rank were arrested at the direction of the Secret Service while peacefully attending a speech by President Bush.  Their "crime" was wearing t-shirts critical of the President.  The charges against

the Ranks were dropped.  The Ranks sued and ultimately received $80,000 in settlement.

   (j)  On July 13, 2004, in Duluth, Minnesota, in connection with a presidential visit, the Secret Service had photographs posted at security checkpoints of three individuals who had indicated in a news story that they intended to protest against the President.

   (k)  On August 26, 2004, in Farmington, New Mexico, the Secret Service denied entrance to an individual who had a ticket for a Bush-Cheney rally because they believed the individual was there to protest.

   (l)  On September 9, 2004, in Colmar, Pennsylvania, a suburb of Philadelphia, the Secret Service, in conjunction with Bush campaign staffers, directed the arrest and detention of seven AIDS activists who protested during a speech by President Bush and the Secret Service agents then threatened to bar journalists who sought access to the activists from returning to the speech.

   83.  These other instances of actions by the Secret Service against anti-governmental expressive conduct constitute a pattern and practice, warranting judicial relief.

   84.  The Secret Service's sham written guidelines, directives, instructions and rules described in paragraph 71 of this Complaint do not represent the actual policy and practice of the Secret Service, but rather were designed to conceal and immunize from judicial review the Secret Service's unlawful and unconstitutional pattern and practices.

   85.  Secret Service agents have engaged in conduct and actions to suppress and stifle anti-governmental expressive conduct and/or speech or conduct critical of Secret Service protectees and have not been disciplined or corrected for engaging in such actions.

### Plaintiffs' Injuries

   86.  As a result of Defendants' actions, Plaintiffs and Plaintiff Class members suffered damages in the form of loss of their rights under the United States Constitution, First, Fourth, Fifth and Fourteenth Amendments, the Oregon Constitution, Article I, Sections 8, 9, 20, and 26, and their common law rights, and physical and emotional injuries, pain and suffering. The experience was especially traumatic, both physically and emotionally, for the children, some

Page 26 – SECOND AMENDED COMPLAINT

of whom are now fearful about attending future demonstrations and of police officers.

87.    Plaintiffs, Plaintiff Class members and other Green Party members desire and intend to continue demonstrating peacefully in proximity to federal officials who are protected by the Secret Service, both in Jackson County and elsewhere.  It is likely and foreseeable that Plaintiffs, Plaintiff Class members and other Green Party members will again be harmed by the practices described in this Second Amended Complaint.

88.    Plaintiffs, Plaintiff Class members and Green Party members are under a real and immediate threat that, unless the Secret Service Defendants and the State and Local Police Defendants are enjoined from doing so, they will continue the pattern and practices described in this Second Amended Complaint.

89.    Such pattern and practices threaten Plaintiffs, Plaintiff Class and Green Party members with being banned from exercising their First Amendment rights in locations proximate to the President, Vice President, or other Secret Service protectees, despite the fact that pro-government demonstrators and/or other unscreened members of the public whose assembling does not involve political or expressive content will be allowed in such locations.

90.    Such pattern and practices threaten Plaintiffs, Plaintiff Class and Green Party members with being subjected to having lawful and orderly demonstrations which they organize or in which they participate stopped, disrupted, and assaulted in the manner that occurred in the October 14, 2004, Jacksonville demonstration.

91.    The aforesaid threats inhibit Plaintiffs, Plaintiff Class members and Green Party members from organizing and participating in such demonstrations, from encouraging others to do so, and from encouraging others to bring their children to these events as an educational democratic activity.

92.    Plaintiffs and Plaintiff Class members have no adequate remedies at law for the injuries described in paragraphs 87 to 91 of this Second Amended Complaint.

93.    At the time that the Defendants took the aforesaid actions against them, class members were exercising federal and state constitutional rights and common law rights and

were not in violation of any law. Defendants violated the federal and state constitutional rights and common law rights of the class members. There was no reasonable or lawful basis for the Defendants to take such actions.

94.     The actions of Defendants were within the scope of their employment.

95.     The individual Police Defendants were acting under color of state law.

96.     Defendants Towe, Rodriguez, Winters and the other individual State and Local Police Defendants personally directed and approved of the actions of the police against Plaintiff Class, and personally directed and approved of permitting the pro-Bush demonstrators and unscreened diners, guests, and visitors, including the assembled medical group, inside the Jacksonville Inn to remain in the vicinity undisturbed and unrestricted.

97.     The Police Defendants' actions and the actions of the police officers in using overwhelming and excessive force, including the use of officers clad in riot gear, against unarmed, law-abiding peaceful demonstrators exercising their core First Amendment rights of speech and assembly on public sidewalks were the custom, policy or practice of the State of Oregon and Defendants City of Jacksonville and Jackson County and Municipal Does respectively, or were established as such by the individual Police Defendants in taking those actions. The individual Police Defendants had the final decision-making authority and responsibility for establishing the policies of their respective employers. The individual Police Defendants' decisions to order and implement the aforesaid police actions constituted the official policy of their respective public employers.

98.     Both the rights that Plaintiff Class members were exercising, and the fact that the Defendants' actions against them violated those rights, were clearly established and well settled law as of October 14, 2004. Accordingly, the Defendants had no reasonable basis to believe that the Defendants' actions were lawful.

99.     The Defendants' actions against Plaintiff Class in discriminating against them based on the fact, content, and/or viewpoint of their expression and in the use of overwhelming and constitutionally excessive force against them were the result of inadequate

Page 28 – SECOND AMENDED COMPLAINT

and improper training, supervision, instruction and discipline of the Secret Service agents under

the personal direction of Defendant Basham and of the police officers under the personal

directions of the State and Local Police Defendants. Such inadequate and improper training,

supervision, instruction and discipline are the custom and practice of the Defendants. By the

practice or custom of failing to adequately and properly train, supervise, instruct or discipline

their police officers, the Defendants have directly caused the violations of rights that are the

subject of this action.

### FIRST CLAIM FOR RELIEF

**• Violation of First, Fourth, and Fifth Amendment Rights •**

*Against the Secret Service Defendants Only*

100.    Plaintiffs reallege and incorporate by reference the preceding paragraphs

as if fully set forth herein.

101.    On information and belief, all Defendants were acting jointly and in

concert in taking the actions alleged.

102.    The individual Secret Service Defendants, except Defendant Sullivan, are

liable in their individual or personal capacities to Plaintiffs and Plaintiff Class (but not including

Plaintiff Jackson County Green Party) for compensatory damages under *Bivens* v. *Six Unknown

Agents,* 403 U.S. 388 (1971), for the violation of their rights of freedom of speech, assembly, and

association under the First Amendment to the United States Constitution, and of their rights to be

free from unreasonable seizure and assault under the Fourth and Fifth Amendments.

103.    The individual Secret Service Defendants, except Defendant Sullivan,

acted willfully and maliciously, or with indifference or reckless disregard of Plaintiff Class

members' rights or safety, and Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson

County Green Party) are therefore entitled to an award of punitive damages against the

individual Secret Service Defendants in their individual or personal capacities, except Defendant

Sullivan, in an amount to be established at trial.

104.    Plaintiffs and Plaintiff Class are entitled to declaratory relief under *Bivens*

Page 29 – SECOND AMENDED COMPLAINT

against the individual Secret Service Defendants in their individual or personal capacities, except Defendant Sullivan, declaring that one or more of them violated Plaintiffs and Plaintiff Class's rights of freedom of speech, assembly and association under the First Amendment to the United States Constitution, and their rights to be free from unreasonable seizure and assault under the Fourth and Fifth Amendments.

105.    Plaintiffs and Plaintiff Class are entitled to declaratory and supplemental injunctive relief under 5 U.S.C. § 702 against all Secret Service Defendants in their official capacities and all persons acting in the official capacities as their agents or in concert with them, declaring as unlawful and prohibiting the Secret Service Defendants, and all persons acting as their agents or in concert with them from engaging in the practice of, or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

(a)    Barring or forcing a lawful assembly of people from any area where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

(b)    Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

(c)    Barring or forcing anti-government demonstrators from areas where pro-government demonstrators are allowed to be present;

(d)    Using excessive force to move nonviolent persons;

(e)    Using riot-geared officers at nonviolent demonstrations; or

(f)    Using non-lethal weapons or any form of chemical agents against nonviolent demonstrators.

### SECOND CLAIM FOR RELIEF

**• 42 U.S.C. §1983: Violation of First, Fourth, and Fifth Amendment Rights •**

*Against the State and Local Police Defendants*

106.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

Page 30 – SECOND AMENDED COMPLAINT

107.    The State and Local Police Defendants were acting jointly and in concert and under color of state law to violate the constitutional rights of Plaintiffs and Plaintiff Class.

108.    The Police Defendants, except Defendants McLain and Martz, are liable in their individual or personal capacities to Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) for compensatory damages under 42 U.S.C. §1983 and for attorneys fees under 42 U.S.C. § 1988 for the violation of their rights of freedom of speech, assembly and association under the First Amendment to the United States Constitution, and of their rights to be free from unreasonable seizure and assault under the Fourth and Fifth Amendments, and to all these rights as incorporated and applied through the Fourteenth Amendment.

109.    The individual Police Defendants, except Defendants McLain and Martz, acted willfully and maliciously, or with indifference or reckless disregard of Plaintiff Class members' rights or safety, and Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) are therefore entitled to an award of punitive damages against the individual Police Defendants, except Defendants McLain and Martz, in their individual or personal capacities in an amount to be proven at trial.

110.    Plaintiffs and Plaintiff Class are entitled to declaratory relief against the Police Defendants in their individual or personal capacities, except Defendants McLain and Martz, declaring that one or more of them violated Plaintiffs and Plaintiff Class's rights of freedom of speech, assembly and association under the First Amendment to the United States Constitution, and their rights to be free from unreasonable seizure and assault under the Fourth and Fifth Amendments, as incorporated and applied through the Fourteenth Amendment.

111.    Plaintiffs and Plaintiff Class are entitled to injunctive relief against the Police Defendants in their official capacities and all persons acting in their official capacities as their agents or in concert with them, prohibiting the Police Defendants, and all persons acting as their agents or in concert with them from engaging in the practice of, or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

(a)    Barring or forcing a lawful assembly of people from any area where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

(b)    Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

(c)    Barring or forcing anti-government demonstrators from areas where pro-government demonstrators are allowed to be present;

(d)    Using excessive force to move nonviolent persons;

(e)    Using riot-geared officers at nonviolent demonstrations; or

(f)    Using non-lethal weapons or any form of chemical agents against nonviolent demonstrators.

### THIRD CLAIM FOR RELIEF

### • Violation of Rights Under Oregon Constitution •

### *Against the Local Police Defendants*

112.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

113.    The Local Police Defendants are liable to Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) for compensatory damages for the violation of their rights under the Oregon Constitution, Article I, Sections 8, 9, 20 and 26.

114.    Plaintiffs and Plaintiff Class are entitled to declaratory and injunctive relief against the Local Police Defendants, declaring that one or more of them violated Plaintiffs and Plaintiff Class's rights of freedom of speech, assembly and association, and their rights to be free from unreasonable seizure and assault under the Oregon Constitution, Article I, Sections 8, 9, 20 and 26, and prohibiting the Local Police Defendants, and all persons acting as their agents or in concert with them from engaging in the practice of, or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

(a)    Barring or forcing a lawful assembly of people from any area

Page 32 – SECOND AMENDED COMPLAINT

where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

       (b)    Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

       (c)    Barring or forcing anti-government demonstrators from areas where pro-government demonstrators are allowed to be present;

       (d)    Using excessive force to move nonviolent persons;

       (e)    Using riot-geared officers at nonviolent demonstrations; or

       (f)    Using non-lethal weapons or any form of chemical agents against nonviolent demonstrators.

       115.    Plaintiffs and Plaintiff Class are entitled to an award of attorney fees against the Local Police Defendants pursuant to *Armatta v. Kitzhaber,* 327 Or 250 (1998).

## FOURTH CLAIM FOR RELIEF

### Violation of Oregon Common Law Against the Local Police Defendants

       116.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

       117.    The Local Police Defendants are liable to Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) for compensatory damages under the common law of Oregon for assault and battery, false imprisonment and negligence.

       118.    Timely notices of claims were filed pursuant to the Oregon Tort Claims Act.

## PRAYER FOR RELIEF

       WHEREFORE, the named Plaintiffs, on behalf of themselves and Plaintiff Class, request:

       1.    An Order certifying this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying the named Plaintiffs as class

representatives and designating Steven M. Wilker, Paul W. Conable, James K. Hein, Ralph J. Temple, and Arthur B. Spitzer as class counsel;

        2.      On the First Claim for Relief, a judgment:

        (a)      For compensatory damages in favor of Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) against one or more of the individual Secret Service Defendants in their individual or personal capacities, except Defendant Sullivan, jointly and severally;

        (b)      For punitive damages in favor of Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) against one or more of the individual Secret Service Defendants in their individual or personal capacities, except Defendant Sullivan;

        (c)      Declaring that one or more of the individual Secret Service Defendants in their individual or personal capacities, except Defendant Sullivan, violated Plaintiffs and Plaintiff Class's rights of freedom of speech, assembly and association under the First Amendment to the United States Constitution, and their rights to be free from unreasonable seizure and assault under the Fourth and Fifth Amendments; and

        (d)      Declaring unlawful the following practices, and ordering supplemental injunctive relief under 5 U.S.C. § 702, prohibiting the Secret Service Defendants in their official capacities, and all persons acting in their official capacities as their agents or in concert with them from engaging in the practice of, or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

        (i)      Barring or forcing a lawful assembly of people from any area where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

        (ii)      Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

        (iii)      Barring or forcing anti-government demonstrators from

areas where pro-government demonstrators are allowed to be present;

>           (iv)    Using excessive force to move nonviolent persons;

>           (v)     Using riot-geared officers at nonviolent demonstrations; or

>           (vi)    Using non-lethal weapons or any form of chemical agents

against nonviolent demonstrators.

3.      On the Second Claim for Relief, a judgment:

>       (a)     For compensatory damages in favor of Plaintiffs and Plaintiff

Class (but not including Plaintiff Jackson County Green Party) against one or more of the

individual Police Defendants in their individual or personal capacities, except Defendants

McLain and Martz, jointly and severally;

>       (b)     For punitive damages in favor of Plaintiffs and Plaintiff Class (but

not including Plaintiff Jackson County Green Party) against one or more of the individual Police

Defendants in their individual or personal capacities, except Defendants McLain and Martz;

>       (c)     Declaring that one or more of the individual Police Defendants in

their individual or personal capacities, except Defendants McLain and Martz, violated Plaintiffs

and Plaintiff Class's rights of freedom of speech, assembly and association under the First

Amendment to the United States Constitution, and their rights to be free from unreasonable

seizure and assault under the Fourth and Fifth Amendments, as incorporated and applied through

the Fourteenth Amendment; and

>       (d)     Enjoining the Police Defendants in their official capacities, and all

persons acting in their official capacities as their agents or in concert with them from engaging in

the practice of, or continuing a pattern and practice of, or requesting or encouraging others to

engage in the practice of:

>           (i)     Barring or forcing a lawful assembly of people from any
>           area where they have a lawful right to assemble, where there is no reasonable
>           security reason to so bar or force them;

>           (ii)    Barring or forcing a lawful assembly of people from areas

Page 35 – SECOND AMENDED COMPLAINT

where other unscreened members of the public are allowed to congregate or be present;

        (iii)    Barring or forcing anti-government demonstrators from areas where pro-government demonstrators are allowed to be present;

        (iv)    Using excessive force to move nonviolent persons;

        (v)    Using riot-geared officers at nonviolent demonstrations; or

        (vi)    Using non-lethal weapons or any form of chemical agents against nonviolent demonstrators.

4.    On the Third Claim for Relief, a judgment:

(a)    For compensatory damages in favor of Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) and against Local Police Defendants for the violation of their rights under the Oregon Constitution, Article I, Sections 8, 9, 20 and 26.

(b)    Declaring that one or more of the Local Police Defendants violated Plaintiffs and Plaintiff Class's rights of freedom of speech, assembly and association, and their rights to be free from unreasonable seizure and assault under the Oregon Constitution, Article I, Sections 8, 9, 20 and 26;

(c)    Enjoining the Local Police Defendants, and all persons acting as their agents or in concert with them from engaging in the practice of, or continuing a pattern and practice of, or requesting or encouraging others to engage in the practice of:

        (i)    Barring or forcing a lawful assembly of people from any area where they have a lawful right to assemble, where there is no reasonable security reason to so bar or force them;

        (ii)    Barring or forcing a lawful assembly of people from areas where other unscreened members of the public are allowed to congregate or be present;

        (iii)    Barring or forcing anti-government demonstrators from

areas where pro-government demonstrators are allowed to be present;

               (iv)     Using excessive force to move nonviolent persons;

               (v)     Using riot-geared officers at nonviolent demonstrations; or

               (vi)     Using non-lethal weapons or any form of chemical agents

against nonviolent demonstrators.

        5.     On the Fourth Claim for Relief, a judgment for compensatory damages in favor of Plaintiffs and Plaintiff Class (but not including Plaintiff Jackson County Green Party) and against Local Police Defendants under the common law of Oregon for assault and battery, false imprisonment and negligence.

        6.     Pre-and post-judgment interest on all amounts awarded;

        7.     Costs, disbursements, and reasonable attorney fees; and

        8.     Such other and further relief, including injunctive relief, as is just and proper under the circumstances.

### JURY DEMAND

        Plaintiffs request a jury trial for all issues so triable.

DATED October 15, 2009        TONKON TORP LLP

                        By */s/ Steven M. Wilker*
                        **Steven M. Wilker,** OSB # 91188
                        Direct Dial:  503.802.2040
                        Attorneys for Plaintiffs
                        Cooperating Attorney for ACLU Foundation of
                        Oregon, Inc.

099997/31557/1750918v6



KEY NOTES

RELATIVE DENSITY OF PEOPLE

Ⓐ PRO-BUSH DEMONSTRATORS

Ⓑ ANTI-BUSH DEMONSTRATORS

Ⓒ DIRECTION OF TRAVEL FROM ALLEY



**SITE PLAN**
SCALE: 1" = 50'-0"

EXHIBIT A TO SECOND AMENDED COMPLAINT
Page 1 of 1

# Exhibit C



# PRESIDENTIAL ADVANCE MANUAL

## OFFICE OF PRESIDENTIAL ADVANCE

### October 2002

*NOTE: It is a violation of Federal law to duplicate or reproduce this manual without permission. It is not to be photocopied or released to anyone outside of the Executive Office of the President, White House Military Office or United States Secret Service. It has been developed for your guidance and is intended for your personal use. For more information, please contact the Office of Presidential Advance at (202) 456-5309.*

Manual # _____

## SENSITIVE – DO NOT COPY

1



US 12

# TABLE OF CONTENTS

I.      Introduction to Advance

II.     The Role of Advance: Office and Team Structure

III.    Types of Presidential Events, Building the Event Site, and
        Technical Requirements

IV.     Building the Local Organization and Working with Vendors

V.      Crowd-Raising and Ticket Distribution

VI.     Press Advance

VII.    Backstage and "The Announce"

VIII.   The President's Schedule, Scenarios, and Diagrams

IX.     Other Agencies and Divisions: White House Military Office,
        United States Secret Service and White House Office of
        Administration

X.      Hotel Advance

        XI.    Motorcade Procedures

        XII.   Quick References
               -Advance Checklists
               -Important Callers/Contact List
               -Flag Etiquette
               -Advance Glossaries
               -Press Advance Materials
               -Sample Event Diagram
               -Sample Event Scenario
               -Chronology of an Advance Trip

US 13

2

[Pages 2-11 redacted]

US 14

[redacted]

**Summary**

[redacted]

The President participates in various types of events.  However, the principles and guidelines covered in this manual can be applied to any type of event.  Common events are speeches (to both large and small groups), rallies, roundtable meetings and tours.

US 15

[Pages 13-31 redacted]

US 16

# Section V. Crowd Raising and Ticket Distribution

[redacted]

[redacted]

The Lead Advance will assign a member of the Advance Team or trusted volunteer to help raise the crowd and to organize a ticket distribution system. Proper ticket distribution is vital to creating a well-balanced crowd and deterring potential protestors from attending events. The amount and type of tickets will be determined on an event basis by the Lead Advance and the Advance Office. Each ticket type will be numbered in order to track distribution and facilitate the placement of groups or people at the event.

## Distribution

Tickets will be sent to the Lead Advance for distribution. The Office of Presidential Advance, the Office of Political Affairs, and the division responsible for the event will determine the distribution groups. In most cases, tickets should be distributed from the Advance Staff office. The Lead Advance will choose a trusted local volunteer to handle the actual distribution of tickets. Groups will be allocated tickets by number and must sign for tickets upon pick-up. Groups should be encouraged to request only the amount of tickets that they can use and tickets that are not issued must be returned to the Lead Advance.

[redacted]

US 17

EXHIBIT B TO SECOND AMENDED COMPLAINT
Page 7 of 13

[redacted]

Typically, tickets will be divided into two different categories. In some cases, depending on the type and event size, there will be additional categories added. There will also be an additional 15-20 percent above the tickets ordered printed in order to ensure that the event is full and there are no empty seats or areas. The categories are:

> VIP            These tickets should be used to highlight a group involved in the theme of event and in limited numbers to members of the State Party, Local Officials, the Host of the Event, or other groups extremely supportive of the Administration. These seats are usually located behind the podium or in the area between the stage and the main camera platform.

> GENERAL     Tickets distributed as general seating. These tickets represent the bulk of the seating at large events.

**Ticket Collection**

Ticket collection at events should take place prior to the magnetometer checkpoint. Volunteers should be used to form the crowd into lines, check for signs or protestors, and to remove the stubs on official tickets. Homemade signs are not allowed at events.

[redacted]

**Demonstrators**

Always be prepared for demonstrators, even if the local organization tells you that there will not be any. It is the responsibility of the Lead Advance to have in place an effective plan for dealing with demonstrators.

33

US 18

**Preventing Demonstrators**
As mentioned, all Presidential events must be ticketed or accessed by a name list. This is the best method for preventing demonstrators. People who are obviously going to try to disrupt the event can be denied entrance at least to the VIP area between the stage and the main camera platform. That does not mean that supporters without tickets cannot be given tickets at the door and gain entrance to the event. It is also not the responsibility of the Secret Service to check the tickets of the people entering. They are concerned whether the person is a threat physically to The President and not a heckler. It is important to have your volunteers at a checkpoint before the Magnetometers in order to stop a demonstrator from getting into the event. Look for signs that they may be carrying, and if need be, have volunteers check for folded cloth signs that demonstrators may be bringing to the event.

For fundraising events,      [redacted]

**Preparing for Demonstrators**
There are several ways the advance person can prepare a site to minimize demonstrators. First, as always, work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route.

The formation of "rally squads" is a common way to prepare for demonstrators by countering their message. This tactic involves utilizing small groups of volunteers to spread favorable messages using large hand held signs, placards, or perhaps a long sheet banner, and placing them in strategic areas around the site.

These squads should be instructed always to look for demonstrators. The rally squad's task is to use their signs and banners as shields between the demonstrators and the main press platform. If the demonstrators are yelling, rally squads can begin and lead supportive chants to drown out the protestors (USA!, USA!, USA!). As a last resort, security should remove the demonstrators from the event site. The rally squads can include, but are not limited to, college/young republican organizations, local athletic teams, and fraternities/ sororities.

For larger rallies, the squads should be broken up into groups of approximately 15-25 people. A squad should be placed immediately in front of the stage, immediately in front of the main camera platform, close to the cut platform, immediately behind the stage area (if people are being used as the backdrop), and at least one squad should be 'roaming' throughout the perimeter of the event to look for potential problems.

**Being aware of Demonstrators**
It is important for the Advance Team and all volunteers to be on the lookout for potential demonstrators. Volunteers should be instructed to contact the Advance person on site (whether it is the Lead, Press or Site Advance) when they see demonstrators. Always check with local police to inquire of any demonstration permits issued prior to a visit.

.US 19

EXHIBIT B TO SECOND AMENDED COMPLAINT
Page 9 of 13

**Handling Demonstrators**

Once a group of demonstrators has been identified, the Advance person must decide what action to take. If it is determined that the media will not see or hear them and that they pose no potential disruption to the event, they can be ignored. On the other hand, if the group is carrying signs, trying to shout down the President, or has potential to cause some greater disruption to the event, action needs to be taken immediately to minimize the demonstrator's effect.

Before reacting to demonstrators, the Advance person should inform the rest of the Advance Team, the Tour Director, and the Press Advance Director of the situation. Be prepared to give the number of demonstrators, location(s), a description, and their issue/organization.

If the demonstrators appear to be a security threat notify the Secret Service immediately. If demonstrators appear likely to cause only a political disruption, it is the Advance person's responsibility to take appropriate action. Rally squads should be dispatched to surround and drown out demonstrators immediately.

**Remember - avoid physical contact with demonstrators!**  Most often, the demonstrators want a physical confrontation. Do not fall into their trap! Also, do not do anything or say anything that might result in the physical harm to the demonstrators. Before taking action, the Advance person must decide if the solution would cause more negative publicity than if the demonstrators were simply left alone.

US 20

EXHIBIT B TO SECOND AMENDED COMPLAINT
Page 10 of 13

[Pages 36-66 redacted]

US 21

EXHIBIT B TO SECOND AMENDED COMPLAINT
Page 11 of 13

## The White House Office of Administration (OA)

[redacted]

**Events**

While on the road, you will encounter two classifications of events: Official and Political. Official events are those that the President is participating in on behalf of the Administration. These may include Education, Welfare, Defense or any topic on which the President is introducing or advocating an issue. All costs from these events are handled by OA, regardless of the source of payment. Your OA Representative will be responsible for payment for all costs associated with the event, such as sound, light, staging, pipe and drape, bike rack, etc. It is extremely important that you collect invoices from vendors as soon as possible, allowing you and the OA Representative to review the invoice for inaccuracies and validity.

The OA Representative handles no part of and is not responsible for any cost incurred for a political event. Political events are those held on behalf of a particular candidate or office holder and typically involve fundraising activities. Federal law prohibits OA Representatives from having any participation in such events.

[redacted]

**If you are handling the political part of a trip, the Republican National Committee will handle your per diem and expenses.**

US 22

EXHIBIT B TO SECOND AMENDED COMPLAINT
Page 12 of 13

[Pages 68-103 redacted]

US 23