FILED'10 AUG 4 9:25USDC-ORM

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# MEDFORD DIVISION

**MICHAEL MOSS, et al.,**

     Plaintiffs,

  v.

**UNITED STATES SECRET SERVICE,**
Department of Homeland Security, et al.

    Defendants.

Case Number CV 06-3045-CL

**REPORT & RECOMMENDATION**

Clarke, Magistrate Judge:

  Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and <u>Bivens v. Six Unknown

Agents</u>, 403 U.S. 388 (1971) alleging claims for violations of the First, Fourth, Fifth, and

Fourteenth Amendments, the Oregon Constitution, and Oregon common law by Defendants.

They seek compensatory and punitive damages and injunctive and declaratory relief from

Defendants for alleged unconstitutional, unlawful, and tortious actions against Plaintiffs and

Plaintiff Class, arising out of and related to Defendants' disruption of Plaintiffs' lawful assembly

Report & Recommendation  1

and protest demonstration in Jacksonville, Oregon, on October 14, 2004.

Named Plaintiffs[1] include Michael Moss, Lesley Adams, Beth Wilcox, Richard Royer, Lee Frances Torelle, Mischelle Elkovich, Anna Vine, and the Jackson County Pacific Green Party.

Named Defendants include United States Secret Service of the Department of Homeland Security ("Defendant Secret Service"), Mark Sullivan, Tim Wood, Rob Savage, John Doe 1, David Towe, City of Jacksonville, Ron Ruecker, Timothy F. McLain, Randie Martz, Eric Rodriguez, Mike Winters, Jackson County, and John Does 2-20, Municipal Doe Defendants.

For the purposes of this report and recommendation, the defendants will be referred to by the following:

"Secret Service Defendants" or "Federal Defendants":  Defendant Secret Service and individual defendants Sullivan, Basham, Wood, Savage, and John Doe 1.

"State Defendants":  Defendants Ruecker, McLain, Martz, and Rodriguez.

"Local Defendants":  City of Jacksonville, Jackson County, individual defendants Towe, Winters, John Does 2-20, and Municipal Doe Defendants.

Plaintiffs filed their second amended complaint ("SAC") on October 15, 2009.[2]  Before

---

[1] Plaintiffs seek class certification (SAC ¶¶ 31-34), but the court declines to address this issue in the present report and recommendation.   Federal Rule of Civil Procedure 23(c)(1)(A) explains that the court must determine whether to certify the action as a class action "at an early practicable time" after a suit has been filed.  However, "in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or a motion to dismiss prior to a ruling on class certification."  Wright v. Schock, 742 F.2d 541, 545-46 (9th Cir. 1984).

[2] Plaintiffs first brought this action in July 2006.  Defendants, collectively, filed several motions to dismiss and a motion for summary judgment.   The court granted in part and denied in part the motions.  Federal Defendants filed an interlocutory appeal with the Ninth Circuit Court of Appeals.  The Ninth Circuit reversed the court's decision but granted Plaintiffs leave to amend.  Plaintiffs amended their complaint, supplementing facts, re-pleading claims previously dismissed, and pleading new claims.

Report & Recommendation  2

the court are Defendants' motions to dismiss and motion for summary judgment. The motions are granted as to all claims previously dismissed by this court on June 8, 2007[3] to include all injunctive and declaratory relief claims, claims for relief for violations of the Fifth and Fourteenth Amendment, and claims for relief under the Oregon Constitution. (Report & Recommendation, Dkt. No. 107 ("2007 R&R") 35.) As to specific motions before the court:

Federal Defendants' motion to dismiss (#164) is denied in part and granted in part. Motion is denied as to Plaintiffs' claims for damages from individual federal defendants for violation of the First Amendment rights. Consistent with the 2007 R&R, motion is granted to dismiss claims against Basham for lack of personal jurisdiction, and the <u>Bivens</u> claim against federal defendants for violations of Fourth Amendment rights.

State Defendants' motion to dismiss (#162) is granted in part and denied in part. Motion is granted to dismiss claims against Ron Ruecker and Eric Rodriguez in their individual capacities for violations of their First Amendment right. Motion is denied as to claims for violations of Fourth Amendment.

Jackson County Defendants' motion to dismiss (#154) is granted, consistent with the 2007 R&R as to injunctive and declaratory relief and relief under the Oregon Constitution.

City of Jacksonville Defendants' motion to for summary judgment (#156) is construed as a motion to dismiss as to Plaintiffs' § 1983 claims.[4] The motion is granted as claims for violation of Plaintiffs' First Amendment rights and denied as to claims for violations of Fourth

---

[3] Court has carefully reviewed its June 2007 decision and sees no reason to disturb those rulings.

[4] City Defendants also filed a motion for summary judgment to the FAC. (Dkt. No. 56.) On April 27, 2007, the court held that motion in abeyance pending the close of discovery. (Dkt. No. 103.)

Report & Recommendation  3

Amendment rights.  City Defendants' motion for summary judgment as to claims under Oregon

common law is premature and held in abeyance pending the close of discovery.

## I.    Procedural History

### A.    First Amended Complaint

Plaintiffs filed their complaint on July 6, 2006, and filed their first amended complaint

("FAC")  on September 26, 2006, alleging claims for violations of the First, Fourth, Fifth, and

Fourteen Amendments, as well as state law claims for violations of the Oregon Constitution, and

Oregon common law claims of  assault and battery, false imprisonment, and negligence.

Plaintiffs sought declaratory and injunctive relief, compensatory and punitive damages, interest,

attorneys fees, and costs. (Dkt. Nos. 1 and 21.)  Defendants collectively filed motions to dismiss

and a motion for summary judgment.  (Dkt. Nos. 52, 53, 56, 62, 68, and 72.)  The court

determined that Defendants' summary judgment motions should be held in abeyance pending the

close of discovery and considered only the motions to dismiss.  (Dkt. No. 103.)

After oral argument, Magistrate Judge Mark Clarke recommended that these motions be

granted in part and denied in part.

> Specifically, the court finds that: 1) plaintiffs' allegations fail to establish plaintiffs
> have standing to seek prospective relief; 2) plaintiffs' substantive due process
> claims are barred as they are covered by the First and Fourth Amendments; 3)
> plaintiffs cannot seek damages for violations of the Oregon Constitution; 4) to the
> extent that plaintiffs are suing state officials in their official capacity for
> retrospective declaratory relief, plaintiffs' claims are barred by the Eleventh
> Amendment; 5) plaintiffs have failed to establish personal jurisdiction over
> defendant Basham; 6) plaintiffs' complaint fails to state a Fourth Amendment
> claim against defendants Wood and Savage; 7) taking plaintiffs' allegations as
> true, plaintiffs have pleaded a violation of clearly established First Amendment
> law by the federal defendants.

(2007 R&R, 2.) District Court Judge Owen Panner adopted the recommendation.  (Dkt. No. 130.)

Report & Recommendation  4

Claims remaining included:[5]

(1)  against Federal Defendants:  the <u>Bivens</u> claim for Federal Defendants' violation of Plaintiffs' First Amendment Rights and for attorneys fees under § 1988.

(2) against State, County and City Defendants:  § 1983 claims for violations of their First and Fourth Amendment Rights and § 1988 claim for attorney fees.

(3) against City and County Defendants:  § 1983 claims for violations of their First and Fourth Amendment Rights, § 1988 claim for attorneys fees, claims for punitive damages, and claims for compensatory damages for violations of Oregon common law for assault and battery, false imprisonment, and negligence.

Federal Defendants filed an interlocutory appeal, appealing the district court's denial of its motion to dismiss claims against them and the denial of their defense of qualified immunity.  The Ninth Circuit found for the Federal Defendants: "the factual content contained within the complaint does not allow us to reasonably infer that the [Federal Defendants] ordered the relocation of Plaintiffs' demonstration because of its anti-Bush message."  The court concluded that the claim did not satisfy the requirements of <u>Twombly</u> and <u>Iqbal</u>.  <u>Moss v. U.S. Secret Service</u>, 572 F.2d 962, 972 (9th Cir. 2009). The Ninth Circuit reversed the district court's decision but granted Plaintiffs leave to amend their complaint, giving them the opportunity to comply with <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, - - - U.S. - - -,

---

[5]  This court respectfully disagrees with the Ninth Circuit's summary of its R&R, which concluded:  "The magistrate then issued a final [R&R] recommending dismissal of all of Plaintiffs' claims against the state and local defendants."  <u>Moss v. U.S. Secret Service</u>, 572 F.2d 962, 967 (9th Cir. 2009).

Report & Recommendation 5

129 S.Ct. 1937 (2009).  Moss, 572 F.2d at 964.[6]  "They may be able to amend their complaint to include facts that will state a plausible claim, and thus the interests of justice would be served by granting them a chance to do so." Id. at 975.   The case was reversed and remanded on September 8, 2009.  (Dkt. No. 147.)

**B.    Second Amended Complaint**

Plaintiffs filed their second amended complaint ("SAC"; Dkt. No. 151) on October 15, 2009 seeking four claims for relief.  In filing their SAC, Plaintiffs repled claims the district court previously dismissed but were not appealed, though the Ninth Circuit's permission to replead did not encompass previously dismissed claims. Plaintiffs explained, "Although certain of Plaintiffs' claims were dismissed by the court on the Defendants' motions, those claims are restated here so as to preserve them for appeal."  (SAC ¶ 2.)  The court is not revisiting its previous decisions on dismissed claims, and the previous ruling remains the same.

Claims in the SAC are summarized as follows:

(1) *First Claim Against Secret Service Defendants:*

Individual Secret Service Defendants, except Defendant Sullivan, are liable in their individual or personal capacities to Plaintiffs for compensatory damages under Bivens for violations of First, Fourth, and Fifth Amendment rights.  Plaintiffs seek punitive damages and declaratory relief under Bivens as well as declaratory and supplemental injunctive relief under 5 U.S.C. § 702 against all Defendants in their official capacities and all person acting in the official capacities as their agents.

---

[6] Federal Defendants also sought an interlocutory appeal on the district court's deferral of their alternative motion for summary judgment.  The Ninth Circuit concluded, "The attempt is misguided and, if it were to succeed, would deny Plaintiffs a fair opportunity to litigate the merits of their claim." Moss, 572 F.3d at 972.

(2) *Second Claim Against State, Jackson County and City of Jacksonville Defendants:*

Defendants, except State Defendant McLain and Martz, are liable in their individual and personal capacities for compensatory damages under 42 U.S.C. § 1983 and for attorneys fees under 42 U.S.C. § 1988 for violations of their First, Fourth, Fifth, and Fourteenth Amendment rights.    Plaintiffs seek punitive damages and declaratory relief.  Plaintiffs assert they are entitled to injunctive relief from all Defendants in their official capacities and all person acting in the official capacities as their agents.

(3) *Third Claim Against Jackson County and City of Jacksonville Defendants*

Plaintiffs seek compensatory damages for violations of their rights under the Oregon Constitution.  They also seek declaratory and injunctive relief and attorneys fees pursuant to Armatta v. Kitzhaber, 959 O,2d 49 (Or. 1998).  (SAC ¶¶ 112-115.)

(4) *Fourth Claim Against Jackson County and City of Jacksonville Defendants*

Plaintiffs seek compensatory damages under Oregon common law for assault and battery, false imprisonment, and negligence.  (SAC ¶¶ 116-118.)

In the SAC, Plaintiffs pled new facts and asserted new claims (1) against Secret Service Defendants, Sullivan, Basham, Wood, and Savange in their individual or personal capacities for declaratory relief under Bivens for violations of their Constitutional rights under the First, Fourth, and Fifth Amendment (SAC ¶ 105) and (2) against state and local defendants Towe, Ruecker, Rodriguez, McLain, Martz, and Winters in their individual and personal capacities under 42 U.S.C. § 1983 for violations of their constitutional rights under the First, Fourth, and Fifth Amendments.  (SAC ¶ 108.)

Report & Recommendation  7

Defendants filed several motions to dismiss claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  City Defendants filed a motion for summary judgment on all claims against them.  Motions include

(1)    Federal Defendants Secret Service, Mark Sullivan, Ralph Basham, Tim Wood, and Rob Savage's Motion to Dismiss (#165)

(2)    State Defendants Ron Ruecker, Eric Rodriguez, Tim McLain, and Randie Martz's Motion to Dismiss (#162)

(3)    Defendants Jackson County and Mike Winters' Motion to Dismiss (#154),

(4)    Defendants City of Jacksonville and David Towe's Motion for Summary Judgment (#156)

The court heard oral argument on May 12, 2010.

## II.    Background

On October 14, 2004, former President George W. Bush made a campaign appearance in Central Point, Oregon.  The President was scheduled to spend the evening at the Honeymoon Cottage in Jacksonville, Oregon.  Plaintiffs, who had learned of the President's plan to visit Jacksonville, organized a demonstration to their express opposition to the President and his policies.  Plaintiffs assert they communicated their plans with Defendant Towe of the City of Jacksonville and Defendant Winters of Jackson County.  (SAC ¶¶ 40-41.)   Around 6:00 pm, Plaintiffs, consisting of approximately 200 to 300 anti-Bush demonstrators, assembled on California Street between Third and Fourth Streets, where the Jacksonville Inn (the "Inn") was located.  The Honeymoon Cottage was approximately two blocks south of the Inn.

A similarly sized group of pro-Bush demonstrators assembled adjacent to the anti-Bush

demonstrators, beginning at the western curb of Third Street and extendeding west along California Street. They were separated from the anti-Bush demonstrators by the 37-foot width of Third Street. (SAC ¶¶ 45-48.)

En route to Jacksonville, the President decided to dine at the Inn.   At approximately 7:00 pm, both pro-Bush and anti-Bush demonstrators learned of the President's change of plans. Demonstrators in both groups clustered to the north side of California Street.  Plaintiffs assert that both groups had equal access to the President upon his arrival and were positioned to have equal access during his departure, had they remained in the same locations. (SAC ¶ 48.)

Prior to the President's arrival, state and local law enforcement officers cleared the alleyway behind the Inn to provide back entrance access and began restricting the movements of some of the demonstrators outside the Inn.  Plaintiffs allege State and Local Defendants' law enforcement officers, dressed in riot gear, cleared the Third Street alley to the patio dining area and directly behind the Inn.  Plaintiffs assert these actions were taken at the request of a Secret Service agent. Law enforcement officers blocked Third Street, including both the sidewalk north of California Street and the California Street alley running along the east side of the Inn.  Law enforcement officers were stationed at the entrance of the California Street alley to prevent any unauthorized persons from entering the alley. (SAC ¶¶ 48-49.)

The President arrived at approximately 7:15 pm, entering the Inn's open air dining patio through a back entrance.  Also present at the Inn were dozens of hotel guests and diners who were permitted to remain inside the Inn without undergoing any form of security screening.  In the upstairs dining area of the Inn was a group of approximately 30 persons affiliated with a medical educational group. These individuals were not screened.  Plaintiffs allege that some

Report & Recommendation  9

members were able to view the President from inside the Inn. For instance, some found an unguarded door leading into the patio dining area from where they could open the door and view the President from a distance of approximately 15 feet. (SAC ¶ 52.)

At approximately 7:30 pm, Secret Service agents directed local and state law enforcement officers to clear California Street between Third and Fourth Streets and move all persons in that area to the east side of Fourth Street and subsequently to the east side of Fifth Street. (SAC ¶ 53.) Federal Defendants claim that the reason for the Secret Services' request to move the persons in that area was because they did not want any one within handgun or explosive range of the President.[7] Plaintiffs assert that this security rationale is false because there was no significant security difference between the two groups – the pro-Bush demonstrators and the anti-Bush demonstrators. (SAC ¶ 55.)

At approximately 7:45 pm a line of police officers, including State and Local Defendants, in riot gear formed across California Street, facing the anti-Bush demonstrators. These officers made amplified announcements stating that the anti-Bush assembly was now unlawful and ordered the anti-Bush demonstrators to move. Plaintiffs allege that State and Local Defendants and law enforcement officers forcefully moved the anti-Bush demonstrators from their location without ascertaining whether the demonstrators heard or understood the announcements. In some instances, Plaintiffs allege, these officers were violent, striking some individuals with clubs and firing pepper spray bullets at them. (SAC ¶ 61.) Plaintiffs further allege that once they were moved beyond Fourth Street to Fifth Street, they were separated into two groups and law

---

[7] The Secret Service's explanation of protecting the President from those within handgun or explosive range will hereinafter be referred to as the "security rationale."

enforcement officers encircled each group, preventing some demonstrators from leaving the area. Some families were separated in the process. (SAC ¶ 61.)

Pro-Bush demonstrators were permitted to remain on the northwest and southwest corners of Third and California Streets. Plaintiffs allege that the anti-Bush group was targeted by the Secret Service and these demonstrators were cleared from the area:

> even though they were much farther from the President than the unscreened diners, hotel guests, and other visitors, including the assembled medical group, inside the Inn, and even though they had no greater access to the President than the pro-Bush demonstrators. In fact, having moved the anti-Bush demonstrators two blocks east the Defendant Secret Service agents left the pro-Bush demonstrators with unimpeded access to the President along the route to the Honeymoon Cottage, demonstrating that the purported reason for moving the anti-Bush demonstrators was false.

(SAC ¶ 57.)    Plaintiffs allege that neither the pro-Bush demonstrators on California Street nor the unscreened diners, hotel guests, and other visitors at the Inn were moved or screened. (SAC ¶ 58.)

Plaintiffs assert that Defendants Towe, Rodriguez, Winters and other individual defendants "personally directed and approved of the action of the police against Plaintiffs . . . and personally directed and approved of permitting the pro-Bush demonstrators and unscreened diners, guests, and visitors . . . to remain in the vicinity undisturbed and unrestricted." (SAC ¶ 96.) Further, Plaintiffs explain,

> The Police Defendants' actions and actions of the police officers in using overwhelming and excessive force, including the use of officers clad in riot gear, against unarmed, law-abiding peaceful demonstrators exercising their core First Amendment rights of speech and assembly on public sidewalks were the custom, policy or practice of the State of Oregon and Defendants City of Jacksonville and Jackson County and Municipal Does respectively, or were established as such by the individual Police Defendants in taking those actions. The individual Police Defendants had the final decision-making authority and responsibility for

Report & Recommendation  11

establishing the policies of their respective employers.  The individual Police
Defendants' decision to order and implement the aforesaid police actions
constituted the official policy of their respective public employees.

(SAC ¶ 97.)

Plaintiffs allege that this is one of several examples of the Secret Service's policy of

discriminating against First Amendment expression, in its cooperation with the Advance Team

under President Bush.  Plaintiffs allege,

> Since the early 1960s, each American President has employed an Advance Team
> to work together with the Secret Service to manage the twin goals of protecting
> the President and providing him access to the public in his public appearances and
> travels.  Each President has established different policies in the balance between
> these two goals.  The Secret Service has a long history of going beyond security
> measures necessary to protect the President, and manipulating its security function
> to protect Presidents from First Amendment-protected expressions of opposition
> by individuals and groups.  This has required the courts periodically to examine
> and declare invalid, unlawful, or excessive, so-called security measures for which
> the Secret Service could not show a reasonable basis.

(SAC ¶¶ 63-64.)  As further evidence of their claim, Plaintiffs point to the coordination of the

Secret Service with the Advance Team and reference the "Presidential Advance Manual," dated

2002, attaching a redacted copy to the complaint.

Plaintiffs allege, "the White House under President George W. Bush, more than any prior

Presidency, sought to prevent or minimize the President's exposure to dissent or opposition

during his public appearances and travels, while at the same time maximizing – within the

demands of reasonable security – his exposure to supporters and to the public in general."  (SAC

¶ 67.)  Plaintiffs allege that the Secret Service Defendants and the Advance Team under

President Bush's administration worked closely together to "concoct, manipulate, and

gerrymander false security rationales for the exclusion or distancing of opposition, dissent, or

Report & Recommendation  12

protest expressive activity from proximity to the President, while minimizing the distancing of

the public in general and supporters." (SAC ¶ 69.)

Further, Plaintiffs allege that the Secret Service had an unwritten policy and practice to

work with the White House to eliminate dissent and protest from presidential appearances. The

policy was put into effect on October 14, 2004:

> there was no time for the Advance Team to take action to stifle and suppress the
> protest. Instead, the President's team relied on the Secret Service to do so by
> directing and requesting local authorities to clear [streets] where protesters
> opposing President Bush were congregated, while leaving undisturbed the nearby
> pro-Bush demonstrators, as well as the unscreened diners, hotel guests, including
> the assembled medical group, who were inside the Inn.

(SAC ¶ 70.)

Plaintiffs also allege that written guidelines, instructions and rules for handling

demonstrations, promulgated or caused to be promulgated by the Secret Service and Defendant

Basham are a sham, "designed to conceal and immunize from judicial review the actual policy

and practice" as evidenced in the events on October 14, 2004. (SAC ¶ 71.) Plaintiffs allege this

policy imposed greater restrictions on Plaintiffs and violated the principles of the First

Amendment that prohibit viewpoint discrimination as related to pro-Bush demonstrators, content

discrimination of political assemblage as related to the medical group, and content or viewpoint

discrimination as related to individual guests and diners at the Inn. (SAC ¶ 73.) They allege the

Secret Service's actions do not comport with normal, lawful Secret Service security measures.

(SAC ¶ 78.)

Plaintiffs allege that the removal of the anti-Bush demonstrators occurred only after the

President entered the dining area and heard chants of the anti-Bush demonstrators. (SAC ¶ 77.)

They assert the proposed security rationale of protecting the President from handgun or explosive range was false and the actions taken were really a part of the Bush Administration's official policy of shielding the President from seeing or hearing anti-Bush demonstrators and preventing anti-Bush demonstrators from reaching the President with their message. Plaintiffs point out that the anti-Bush demonstrators posed no greater risk and, they argue, posed less risk of assaulting the President with a handgun or explosive, than the guests, diners, and the assembled medical group inside the Inn. (SAC ¶¶ 80-81.)

Finally, Plaintiffs include a list of published reports that, they allege, show how the Secret Service has engaged in actions against anti-government expressive activity. These include President Bush's appearances at the following:

(1) March 27, 2001 at Western Michigan University in Kalamazoo, Michigan

(2) August 23, 2002 in Stockton, California

(3) January 22, 2003 in St. Louis, Missouri

(4) September 2, 2002 in Neville Island, Pennsylvania

(5) December 2002 in Philadelphia, Pennsylvania

(6) May 2003 in Omaha, Nebraska

(7) June 17, 2003 in Washington, D.C.

(8) July 2003 in Philadelphia, Pennsylvania

(9) July 4, 2004 in Charleston, West Virginia

(10) July 13, 2004 in Duluth, Minnesota

(11) August 26, 2004 in Farmington, New Mexico

(12) September 9, 2004 in Colmar, Pennsylvania    (SAC ¶ 82.)

Report & Recommendation 14

### III.    Legal Standards of 12(b)(6) Motion to Dismiss

Defendants filed various dispositive motions, arguing the Plaintiffs have not pled facts sufficient to state a claim for relief.

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Id., quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004); see also Fed.R.Civ.P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, ---U.S. ----, 129 S.Ct. 1937, 1949 (2009). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. United States Secret Serv., 572 F.3d 962, 970 (9th Cir.2009), citing Iqbal, 129 S.Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007).  In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. See Kahle v. Gonzales, 474 F.3d 665, 667 (9th Cir. 2007),

Report & Recommendation  15

Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 256 (1994), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

Recent decisions from the U.S. Supreme Court have clarified the pleading requirements under Rule 8. In 2007 the Court's decision in Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), began the most recent discussion, and their decision in Iqbal clarified the standards further. The Ninth Circuit carefully studied both decisions when it evaluated Defendants' interlocutory appeal related to the FAC. This court incorporates the Ninth Circuit's analysis, in part, here.

Twombly concerned a conspiracy claim under Section 1 of the Sherman Act. 550 U.S. at 548-49. The plaintiffs had alleged facts suggesting that the defendant companies had engaged in parallel market conduct, but the plaintiffs did not allege specific facts indicating the existence of an actual agreement in restraint of trade, which was an element of the plaintiffs' cause of action. See id. at 553-57. In reversing the Second Circuit's denial of the defendants' Rule 12(b)(6) motion, the Court held that an antitrust plaintiff must plead a set of facts "plausibly suggesting (not merely consistent with)" a Sherman Act violation to survive a motion to dismiss. Id. at 557.

In its Twombly decision, the Court cautioned that it was not outright overruling Conley v. Gibson, 355 U.S. 41 (1957), the foundational "notice pleading" case construing Federal Rule of Civil Procedure 8(a)(2), but it explained that Conley's oft-cited maxim that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can

Report & Recommendation  16

prove no set of facts in support of his claim which would entitle him to relief," <u>Conley</u>, 355 U.S.

at 45-46, read literally, set the bar too low. <u>See</u> <u>Twombly</u>, 550 U.S. at 561-62. "[A]fter puzzling

the profession for 50 years," the Court concluded, <u>Conley</u>'s "no set of facts" refrain "is best

forgotten as an incomplete, negative gloss on an accepted pleading standard." <u>Id.</u> at 563.

At the same time, the Court appeared to signal that <u>Twombly</u> should not be read as

effecting a sea change in the law of pleadings. <u>Twombly</u> cited <u>Scheuer v. Rhodes</u>, 416 U.S. 232,

236 (1974), for the proposition that pleadings should not be found deficient even if it is apparent

"that a recovery is very remote and unlikely." 550 U.S. at 556. To add to the confusion, in

<u>Erickson v. Pardus</u>, 551 U.S. 89 (2007), decided shortly after <u>Twombly</u>, the Court noted that

"[s]pecific facts are not necessary" for pleadings to satisfy Rule 8(a)(2). <u>Id.</u> at 93 (citing

<u>Twombly</u> (quoting <u>Conley</u> for that proposition).

Much confusion accompanied the lower courts' initial engagement with <u>Twombly</u>.

<u>Compare</u> <u>Kendall v. Visa U.S.A., Inc.</u>, 518 F.3d 1042, 1047 n. 5 (9th Cir. 2008) (stating that, at

least for the purposes of antitrust cases, <u>Twombly</u> abrogated the usual "notice pleading" rule);

<u>and</u> <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 58 (1st Cir. 2008) (concluding that

<u>Twombly</u> provided Rule 12(b)(6) with "more heft"); <u>with</u> <u>Aktieselskabet AF 21. November 2001</u>

<u>v. Fame Jeans</u>, 525 F.3d 8, 15 & n. 3 (D.C.Cir. 2008) (noting disagreement among the circuits

about <u>Twombly</u>'s import and concluding that the case "leaves the long-standing fundamentals of

notice pleading intact").

The Court addressed some of the lower courts' lingering questions in <u>Iqbal</u>, a <u>Bivens</u>

action alleging (among other claims) First Amendment violations.  The Court elaborated on

<u>Twombly</u>'s applicability in the context of a motion to dismiss based on qualified immunity.

Report & Recommendation  17

The plaintiff in Iqbal, a Pakistani Muslim man, was arrested and detained in the days following the attacks of September 11, 2001. 129 S.Ct. at 1942. He alleged that former Attorney General of the United States John Ashcroft and Federal Bureau of Investigation ("FBI") Director Robert Mueller, by specifically authorizing an unconstitutional detention policy, subjected him to "harsh conditions of confinement on account of his race, religion, or national origin." Id.

The Court first explained that "bare assertions. . . amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," for the purposes of ruling on a motion to dismiss, are not entitled to an assumption of truth. Id. at 1951 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955).  Such allegations are not to be discounted because they are "unrealistic or nonsensical," but rather because they do nothing more than state a legal conclusion-even if that conclusion is cast in the form of a factual allegation. Id. Thus, in Iqbal, the Court assigned no weight to the plaintiff's conclusory allegation that former Attorney General Ashcroft and FBI Director Mueller knowingly and willfully subjected him to harsh conditions of confinement "solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Id. (quoting plaintiff's complaint).

After dispatching with the complaint's conclusory allegations, the Court elaborated on Twombly's plausibility standard. "A claim has facial plausibility," the Court explained, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.' " <u>Id.</u> (quoting

<u>Twombly</u>, 550 U.S. at 557, 127 S.Ct. 1955).

In sum, for a complaint to survive a motion to dismiss, the non-conclusory "factual

content" and reasonable inferences from that content must be plausibly suggestive of a claim

entitling the plaintiff to relief. <u>Id.</u>

**IV.     Declaratory or Injunctive Relief Claims**

This court dismissed prospective declaratory and injunctive relief claims of the FAC

because "plaintiffs lack standing, plaintiffs' claim is not ripe for review, and plaintiffs have an

adequate remedy at law." (2007 R&R 35.)  Plaintiffs repled all claims in their SAC, including

claims previously dismissed by this court, and pled new claims for declaratory relief against

Federal Defendants in their official capacities.

Federal Defendants argue that because the court has previously dismissed injunctive and

declaratory relief claims for lack of standing, Plaintiffs' new claim for individual-capacity

equitable relief is "untenable."  They argue, "Plaintiffs <u>also</u> lack standing to seek equitable relief

from . . . Savage and Wood in their individual capacities (it follows, as well, that Plaintiffs'

individual capacity, equitable relief claims are unripe, just as their previously asserted equitable

relief claims were held by this Court to be)."  (Fed. Defs.' Mem. 34.)

Though Plaintiffs have re-pled and supplemented their claims, the allegations that support

claims for declaratory and injunctive relief remain materially the same.  The court's previous

ruling dismissed these claims, and this decision is not disturbed.

> Plaintiffs' allegations are insufficient to support a claim for equitable
> relief. The threat of future injury to plaintiffs is based on an extended chain of
> speculative contingencies and some day intentions which are insufficient to

Report & Recommendation  19

support standing. <u>Anoushiravani v. Fishel</u>, 2004 WL 1630240 at *4 (D.Or.). The allegations in plaintiffs' complaint fail to establish that plaintiffs have standing to seek prospective relief. Although plaintiffs allege a pattern and practice of conduct by the Secret Service, plaintiffs have not alleged that they have been injured either before or after the October 14 demonstration or that they plan to demonstrate at any particular time or place in the future. Unlike the pattern and practice cases cited by plaintiffs, plaintiffs have not shown that they have been personally injured by this alleged pattern and practice, other than at the October 14 demonstration. The lack of such allegations distinguishes this case from <u>Marbet v. City of Portland</u>, 2003 WL 23540258 (D.Or.) and other pattern and practice cases relied upon by plaintiffs. The lack of such allegations cannot be resolved by class certification.

. . . .

Plaintiffs subjective feelings of inhibition to participate in future demonstrations are not sufficient. <u>Laird v. Tatum</u>, 408 U .S. 1, 13-14 (1972). Plaintiffs have not pled a real and immediate threat. The court finds both <u>Elend v. Sun Dome, Inc.</u>, 370 F.Supp.2d 1206 (M.D. Fla. 2005) and <u>Acorn v. City of Philadelphia</u>, 2004 WL 1012693 (E.D. Pa.) persuasive and directly on point. As in those cases, plaintiffs' allegations are insufficient to support standing to seek prospective relief.

The issuance of equitable relief also requires the likelihood of substantial and immediate irreparable harm and an inadequate remedy at law. <u>O'Shea v. Littleton</u>, 414 U.S. 488, 502 (1974). This requirement cannot be met where the threat of injury is conjectural and hypothetical, and there are adequate remedies at law. <u>Id.</u> The allegations in plaintiffs' complaint do not show that they have been previously subjected to the same type of conduct either before and after this incident. This is the only time they have been subjected to this type of treatment. Plaintiffs allegations demonstrate that plaintiffs cannot meet the requirement of showing any real or immediate threat that plaintiffs will be wronged again. <u>See</u> <u>Hodgers-Durgin v. De La Vina</u>, 199 F.3d 1037, 1042-1044 (9th Cir.1999). In addition, plaintiffs have a claim for damages, and, therefore, have an adequate remedy at law. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 109, 113 (1983).

(2007 R&R 33-35.)    Accordingly, any new claims for declaratory or injunctive relief are

dismissed for the same reasons.

## V.    First Amendment Claims

Plaintiffs allege that all Defendants violated their First Amendment rights and seek relief

under <u>Bivens</u> against Federal Defendants and under § 1983 against State, Local, and City

Report & Recommendation  20

Defendants.[8]

## A.    Federal Defendants' Motion to Dismiss First Amendment Claims Is Denied

Federal Defendants filed their motion to dismiss Plaintiffs' claims against Defendants

Wood, Savage, and John Doe 1 for violation of their First Amendment rights.[9]  To survive the

motion, Plaintiffs must plead a plausible <u>Bivens</u> claim.  Plaintiffs must allege a violation of their

constitutional rights by agents acting under the color of federal law.  <u>Morgan v. U.S.</u>, 323 F.3d

776, 780 (2003) (citing <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of</u>

<u>Narcotics</u>, 403 U.S. 388 (1971).

A violation of First Amendment rights may result from content discrimination or

viewpoint discrimination.  "'Content discrimination' occurs when the government 'chooses the

subjects' that may be [publicly] discussed, while 'viewpoint discrimination' occurs when the

government prohibits 'speech by particular speakers,' thereby suppressing a particular view about

a subject." <u>Giebel v. Sylvester</u>, 244 F.3d 1182, 1188 (9th Cir. 2001) (alterations in the original)

(quoting <u>Perry Educ. Ass'n  v. Perry Local Educators' Ass'n</u>, 460 U.S 37, 59 (1983) (Brennan, J.,

dissenting)).  "'[V]iewpoint discrimination' occurs when the government prohibits 'speech by

particular speakers,' thereby suppressing a particular view about a subject." <u>Giebel v. Sylvester</u>,

---

[8] Section 1983 provides a civil action against *persons* who violate an individual's constitutional rights.
Federal employees sued in their individual capacities may be sued for damages as well as declaratory or injunctive
relief.  <u>Hafer v. Melo</u>, 502 U.S. 21, 31 (1991).   Individuals sued in their official capacities may only be sued for
declaratory or injunctive relief.  <u>Ex Parte Young</u>, 209 U.S. 123 (1908).  Further, a state is not a person for the
purposes of this section, but case law, however, treats municipal and local governments as "persons" under the
statute and subject to damages and declaratory or injunctive relief.  <u>Monell v. Dept. of Social Services of New York</u>,
436 U.S. 658, 701 (1978).  Because all injunctive relief claims were dismissed in the 2007 R&R, Plaintiffs'
remaining First Amendment claims under § 1983 are for damages against Defendants Rodriguez, Ruecker, Towe,
Winters, Jackson County, and the City of Jacksonville.

[9]  Plaintiffs include Defendant Basham in their <u>Bivens</u> claim; however, the court determined in 2007 that it
did not have personal jurisdiction.

244 F.3d 1182, 1188 (9th Cir. 2001) (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>,

460 U.S. 37, 59 (1983) (Brennan, J., dissenting)); <u>c.f.</u> <u>R.A.V. v. City of Portland</u>, 505 U.S. 377,

391 (1992). The Supreme Court made it clear that government suppression of speech, based on

the speaker's motivating ideology, opinion, or perspective is impermissible. See <u>Rosenberger v.</u>

<u>Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 828 (1995) ("It is axiomatic that the

government may not regulate speech based on its substantive content or the message it

conveys."); <u>Mahoney v. Babbitt</u>, 105 F.3d 1452, 1456 (D.C.Cir.1997) (holding that the First

Amendment does not permit the federal government to bar ideological opponents from

peacefully protesting on the sidewalks of Pennsylvania Avenue during President Clinton's second

Inaugural Parade).

     This court follows the <u>Iqbal</u> methodological approach to assess the adequacy of

Plaintiffs' complaint, as the Ninth Circuit did when it evaluated the FAC on interlocutory appeal.

> A court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations. When there are well-
> pleaded factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to relief.

<u>Iqbal</u>, 129 S.Ct. at 1950.

### 1.    Summary of Ninth Circuit's Application of <u>Iqbal</u> to FAC

     Because the Ninth Circuit identified areas in the FAC that it found to be deficient of the

pleading the standards, regarding the <u>Bivens</u> claim, this court looks specifically at those areas and

how they were sufficiently re-pled in the SAC. See <u>Moss</u> 572 F.3d at 970-71.

     First, the Ninth Circuit identified three pleadings that were not entitled to the assumption

Report & Recommendation  22

of truth, being that they were no more than legal conclusions and not supported by factual allegations. See Iqbal 129 S.Ct. at 1950.   These pleadings included allegations that (1) Federal Defendants acted on an impermissible motive in relocating Plaintiffs; (2) Federal Defendants ordered the relocation, acting in conformity with an officially authorized *sub rosa* Secret Service policy of suppressing speech critical of the President; and (3) there was systematic viewpoint discrimination at the highest levels of the Secret Service. Moss, 572 F.3d at 970.

Second, the Ninth Circuit determined that the remaining factual allegations did not plausibly suggest a claim for relief.  It concluded, "[t]o prevail on their Bivens claim against individual Agents, Plaintiffs must establish that the Agents ordered the relocation of their demonstration *because of* not merely in spite of, the demonstration's anti-Bush message." Moss, 572 F.3d at 970.

The court identified two remaining non-conclusory factual allegations.  These allegations were offered to show Federal Defendants' disparate treatment towards anti-Bush demonstrators and thus evidence of discriminatory intent.  However, the court concluded the following remaining allegations were not enough: (1) agents ordered the relocation of anti-Bush demonstrators but left a similarly situated pro-Bush demonstration undisturbed and (2) diners and guests inside the Inn were not subjected to the security screening or asked to leave the premises, despite their close proximity to the President. Moss, 572 F.3d at 971.  The court explained, "the factual content contained within the complaint does not allow us to reasonably infer that the Agents ordered the relocation of Plaintiffs' demonstration because of its anti-Bush message, and therefore it fails to satisfy Twonbly and Iqbal." Id. at 972.

Report & Recommendation  23

**2.      Plaintiffs Have Pled a Plausible <u>Bivens</u> First Amendment Claim**

This court now evaluates the plausibility of Plaintiffs' SAC <u>Bivens</u> claim for a violation

of their First Amendment rights by the Federal Defendants acting in their individual capacities.

**a.      Plaintiffs Have Successfully Repled Non-Conclusory**

**Allegations**

The Ninth Circuit summed up its findings discounting specific factual allegations:

> The bald allegation of impermissible motive on the Agents' part, standing alone, is
> conclusory and is therefore not entitled to an assumption of truth.  The same is
> true of Plaintiffs' allegation that, in ordering the relocation of their demonstration,
> the Agents acted in conformity with an officially authorized *sub rosa* Secret
> Service policy of suppressing speech critical of the President. The allegation of
> systematic viewpoint discrimination at the highest levels of the Secret Service,
> without *any* factual content to bolster it, is just the sort of conclusory allegation
> that the *Iqbal* Court deemed inadequate, and thus does nothing to enhance the
> plausibility of Plaintiffs' viewpoint discrimination claim against the Agents.

<u>Moss</u>, 572 F.3d at 970.

Plaintiffs have amended and supplemented their factual allegations.  <u>See</u> <u>Id</u>. at 972, 975.

The "legal conclusions," as identified by the Ninth Circuit in FAC, have now been supported by

factual allegations and are thus entitled to an assumption of truth at this stage of the pleadings.

**i.      Impermissible Motive**

Plaintiffs allege the Federal Defendants acted with an impermissible motive when they

relocated the anti-Bush demonstrators.  They suggest that the Federal Defendants' motive in

moving the anti-Bush demonstrators was not based on their security rationale but based on an

impermissible motive of suppressing anti-Bush demonstrators' speech, thereby violating their

First Amendment rights. (SAC ¶¶ 55, 57.)   Given the additional facts alleged, this allegation is

no longer a "bald legal conclusion."

Report & Recommendation  24

The basis of Plaintiffs' allegation of impermissible motive is that the security rationale was only applied to the anti-Bush demonstrators. Defendants asserted that they relocated the anti-Bush group because they did not want anyone within handgun or explosive range of the President. (SAC ¶ 54.) From this assertion, it follows that anyone who was within handgun or explosive range of the President could expect to be relocated, screened, or at least subject to some other form of security.

On the scene that day, there were many who were in handgun or explosive range of the President, including pro-Bush and anti-Bush demonstrators and certainly guests and diners also at the Inn. All groups had the same notice of the President's arrival at the Inn. Both groups of demonstrators were non-violent, and interactions between these two groups were "courteous and jovial." (SAC ¶ 46.)

Plaintiffs assert that there was no significant security difference between the pro-Bush and anti-Bush groups prior to the President's arrival. (SAC ¶ 54.) Further, the only difference between Plaintiffs and the other groups was the anti-Bush demonstrators' speech. (SAC ¶ 80.)

Plaintiffs also assert that the President was protected from public view, to include both groups of demonstrators, by a wooden fence, six feet in height. (SAC ¶ 51.) Plaintiffs allege the Secret Service secured the alley on California Street with law enforcement officers in riot gear. Neither group of demonstrators had line of sight to the patio where the President was dining, and both groups were blocked by the buildings along California Street. (SAC ¶¶ 49, 50.) Plaintiffs also assert that the diners at the Inn posed a greater security threat to the President because they were simply closer to the President than the groups of demonstrators. (SAC ¶ 57.)

The Secret Service and other law enforcement officers, however, relocated only the pro-

Bush demonstrators two block from their original location, presumably to move them outside the security perimeter and outside the handgun or explosive range. Plaintiffs argue this reason of security, however was false and was only given to cover up the impermissible motive of restricting the anti-Bush demonstrators' speech. They point out that the relocation occurred only after anti-Bush chants and slogan were heard within the patio. (SAC ¶ 53.)

The new facts alleged highlight that those permitted to stay within the security perimeter or within handgun or explosive range were those who either had no expressed view of the President or his policies or who had a positive view. (SAC ¶ 57.) For instance, the guests at the Inn were within handgun or explosive range of the President and yet were subjected to no enhanced security. Further, the pro-Bush demonstrators were able to cheer the President on his motorcade route after his meal, and some guests and diners were able to view the President while he was on the patio from an unlocked door. (SAC ¶¶ 55-56, 62.) Plaintiffs argue,

> [i]f preventing people from being within handgun or explosive range of the President "[h]ad been the true reason for the . . . [order to move the anti-Bush demonstrators], the Defendant Secret Service agents would have requested or directed that the pro-Bush demonstrators at the corner of Third and California be moved further to the west so that they would not be in range of the President as he traveled from the Inn to the Honeymoon Cottage."

(Pls.' Mem. in Opp'n 13, citing SAC ¶ 55.)

Plaintiffs allege the anti-Bush demonstrators were targeted because of their speech. They argue this is plausibly alleged and supported when the court considers that all people within the handgun or explosive range of the President posed the same threat but only those who expressed an anti-Bush message were relocated further from the Inn and further from the President's post-dinner motorcade route.

Report & Recommendation  26

The court agrees.  The allegation that Federal Defendants acted with an impermissible motive is not a legal conclusion and is entitled to assumption of truth for the purposes of this motion.

### ii.      *Sub Rosa* Policy

Plaintiffs assert that the Federal Defendants were operating on a *sub rosa* policy that suppressed the speech of individuals who opposed the President or his policies.  In analyzing the FAC, the Ninth Circuit found that there was no factual support for this allegation.  Plaintiffs have since asserted additional facts supporting their allegation that there was a *sub rosa* policy.

Plaintiffs generally state that the policy and practices of the Secret Service on October 14, 2004, and at other instances over the previous two years violated three principles of the First Amendment:  (1) imposition of greater restrictions on Plaintiffs than on pro-Bush demonstrators outside the Inn, violating the principle of viewpoint discrimination; (2) imposition of greater restrictions on Plaintiffs than on the medical group assembled inside the Inn, violating the principle of content discrimination against political assemblage as compared to non-political assemblage; and (3) imposition of greater restrictions on Plaintiffs than on individual diners and guests inside the Inn, violating the principles that prohibit content discrimination or viewpoint discrimination against persons solely because they are assembled to express a political or opposing view.  (SAC ¶ 73.)

Plaintiffs allege specifically, "[t]he Secret Service's actual but unwritten policy and practice was to work with the White House under President Bush to eliminate dissent and protest from presidential appearances."  (SAC ¶70.)  "[V]iewpoint discrimination by the Secret Service in connection with President Bush was the official policy of the White House."  (SAC ¶ 68.)

Report & Recommendation  27

Plaintiffs allege that the Presidential Advance Manual, put forth by the White House Advance

Team under the Bush Administration, presents sufficient evidence of the Secret Service's

unofficial policy:

> The White House under President George W. Bush, more than any prior
> Presidency, sought to prevent or minimize the President's exposure to dissent or
> opposition during his public appearances and travels, while at the same time
> maximizing – within the demands of reasonable security – his exposure to
> supporters and to the public in general.  This policy was set out in some detail in
> the official "Presidential Advance Manual," dated October 2002, instructing the
> White House Advance Team on how to keep protestors out of the President's
> vicinity and sight. . . . The unredacted excerpts [of the Presidential Advance
> Manual] include discussions about how to deal with protestors, how to disrupt
> protests, and how to insure the protesters are kept out of sight or hearing of the
> President and the media.  These facts demonstrate not just a pattern and practice,
> but an official White House policy of seeking to stifle dissent.

(SAC ¶¶ 67-68.)  Plaintiffs allege that this practice and policy is evidenced by the Secret

Services's actions over the preceding two years against anti-government expressive activity.  (See

SAC ¶82.)

> Regarding the specific event on October 14, 2004, Plaintiffs allege,
>
> when the President's plans changed . . . , there was no time for the Advance Team
> to take action to stifle and suppress the protest.  Instead the President's team relied
> on the Secret Service to do so by directing and requesting local authorities to clear
> both sides of California Street between Third and Fourth Streets, and subsequently
> between Third and Fifth Streets, where protesters opposing President Bush were
> congregated, while leaving undisturbed the nearby pro-Bush demonstrators, as
> well as the unscreened diners, hotel guests, and other visitors, including the
> assembled medical group, who were inside the Inn.

(SAC ¶ 70.)  Plaintiffs argue that the Secret Service's actions "were consistent with and taken

pursuant to the actual but unwritten policy and practice of the Secret Service to shield the

President from seeing or hearing anti-Bush demonstrators and to prevent anti-Bush

demonstrators from reaching the President with their message."  (SAC ¶ 81.)

Report & Recommendation  28

The allegation of a *sub rosa* policy is supported with the excerpts of the Advance Manual. Though this manual was not written for or by the Secret Service, Plaintiffs allege Federal Defendants were implementing this policy when they moved only anti-Bush demonstrators from the location. "[T]he Secret Service worked closely with the Advance Team to achieve the goal set out in the Presidential Advance Manual, and to concoct, manipulate, and gerrymander false security rationales for the exclusion of distancing of opposition, dissent, or protest expressive activity from proximity to the President, while minimizing the distancing of the public in general and supporters." (SAC ¶ 69.)

Specifically, the Advance Manual instructs the Advance Team in the "Preparing for Demonstrators" Section:

> There are several ways the advance person can prepare a site to minimize demonstrators. First, as always, work with the Secret Service and have them ask the local police department to designate a protest area where demonstrators can be placed, preferably not in view of the event site or motorcade route.

(SAC, Ex. B, 9.) Under "Handling Demonstrators", it explains,

> Once a group of demonstrators has been identified, the Advance person must decide what action to take. If it is determined that the media will not see or hear them and that they pose no potential disruption to the event, they can be ignored. On the other hand, if the group is carrying signs, trying to shout down the President, or has potential to cause some greater disruption to the event, action needs to be taken immediately to minimize the demonstrator's effect. . . . If the demonstrators appear to be a security threat notify the Secret Service immediately. If demonstrators appear likely to cause only a political disruption, it is the Advance person's responsibility to take appropriate action.

(SAC, Ex. B, 10.)

As Plaintiffs point out, Federal Defendants' actions mirrored the instructions in this Advance Manual: only the anti-Bush demonstrators were moved, thereby "minimizing" their

threat.  Plaintiffs' allegation of a *sub rosa* policy and the Secret Service's involvement in training

and directing agents on this policy is not conclusory.

The Federal Defendants, however, counter that the Ninth Circuit previoulsy considered

and consequently rejected Plaintiffs' claim of a *sub rosa* policy when it evaluated the sufficiency

of the FAC.  (Federal Defs.' Mem. in Supp. of Mot. to Dismiss ("Fed. Defs.' Mem.")  15-26.)

The court disagrees with this interpretation of the Ninth Circuit decision.  The Ninth Circuit

found that Plaintiffs' allegation of an officially authorized *sub rosa* Secret Service policy was

conclusory and needed some factual allegations if it were to be considered in the complaint's

sufficiency evaluation.  Moss, 572 F.3d at 970. The Ninth Circuit did not specficially place

limitations on what allegations Plaintiffs could re-plead in their First Amendment claim.   Id. at

974-75.

Federal Defendants also object to Plaintiffs' allegations of the dozen previous instances of

the Secret Service's policy of suppressing First Amendment rights. "[T]hese other alleged

incidents are entirely dissimilar to the one at issue here, and, in any event, none of them is said to

have involved Defendants Savage and Wood."  They argue that Wood and Savage cannot be

responsible for policies allegedly promulgated by the federal agency that employs them or for the

implementation of policies by fellow agents around the country.  (Fed. Defs.' Mem. 14-15.)

Federal Defendants want the allegations of previous instances of viewpoint

discrimination disregarded, arguing they do not support a Bivens claim.  They explain,

> Just as those Defendants cannot be subjected to suit for the actions of others . . .
> so too they are not responsible for claimed "policies" allegedly promulgated by the
> federal agency that employs them, or for the alleged implementation of such
> policies by fellow agents around the country. . . . Indeed, the Supreme Court has
> squarely held that a Bivens action such as this is not the proper means to challenge

Report & Recommendation  30